Evan D. Flaschen (EF 6973)
Robert G. Burns (RB 0970)
Andrew J. Schoulder (AS-2018)
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 508 6100
Facsimile:      (212) 508 6101

Proposed Counsel for the Debtors and Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:**<br><br>**MARCO POLO SEATRADE B.V., *et al.*,[1]**<br><br>     **Debtors.** | **Chapter 11**<br><br>**Case No. 11-13634 (JMP)**<br><br>**(Joint Administration Requested)** |

**DECLARATION OF BARRY MICHEL CERNEUS (I) IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS
AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

Barry Michel Cerneus, being duly sworn, deposes and states:

1.       I am the attorney in fact of Seaarland Shipping Management B.V. ("*Seaarland*"),

one of the above-captioned debtors and debtors in possession (collectively, the "*Debtors*").  I

have been working for Seaarland since August 2005.  I am familiar with the Debtors' day-to-day

operations, business, financial affairs and books and records.  In addition, I am generally familiar

with matters relating to international maritime finance, charter parties and commercial vessel

management services, which are among the core operations of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's identification number, include: Marco Polo Seatrade B.V. (5584); Seaarland Shipping Management B.V. (0110); Magellano Marine C.V. (2910); and Cargoship Maritime B.V. (4361).  The Debtors' service address is: Bracewell & Giuliani, LLP, 1251 Avenue of the Americas, 49th Floor, New York, NY 10020, Attn: Robert G. Burns.

2.     I submit this declaration (this "**Declaration**") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Bankruptcy Rules***") in support of the voluntary petitions for relief filed by each of the Debtors under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") and the motions and applications for related relief filed herewith (collectively, the "***First Day Pleadings***").  Any capitalized term not expressly defined herein shall have the meaning ascribed to it in the relevant First Day Pleading.

3.     I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations so as to permit an effective transition into chapter 11, preserve and maximize the value of the Debtors' estates and, ultimately, achieve a successful reorganization.  I also believe that, absent immediate access to additional financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as sought under and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of these estates.

4.     Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge, my review of relevant documents, my reliance on staff members, my opinions based on experience, knowledge and information concerning the Debtors' operations, their financial condition and the shipping industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**I.**
**THE NATURE OF THE DEBTORS' BUSINESS AND THE CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES**

## Overview of the Debtors' Business and Operations

5.      Seaarland, a debtor in these chapter 11 cases, is an international commercial vessel management company that specializes in providing commercial and technical vessel management services to third parties.  Seaarland was founded in 2005.  Its corporate headquarters are located in Amsterdam, the Netherlands, however it is also registered (as of October 14, 2009) in New York as a foreign business corporation.  The Debtors' operations are principally conducted under the name of Seaarland Shipping Management.

6.      Debtor Marco Polo Seatrade B.V. ("*MPS*") is a Dutch company that is also a registered foreign business corporation in New York (registered as of October 14, 2009).  MPS is the record owner of six vessels (collectively, the "*Vessels*"), which are described in more detail below.  MPS is also the sole shareholder of Seaarland.  In addition, MPS is a 50/50 joint venture partner in Futmarine B.V. ("*Futmarine*"), a Dutch private limited liability company, and SynerGas S.r.L ("*SynerGas*").  MPS also owns a 17% interest in Seaarland Shipmanagement Hamburg GmbH & Co. KG ("*SHS*").  Futmarine, SynerGas and SHS are not debtors in these proceedings.

7.      Seaarland owns 100 percent of Debtor Cargoship Maritime B.V. ("*Cargoship*"), which is also involved in charter party contracts with third party ship owners. Cargoship is also registered in New York as a foreign business corporation (registered as of October 14, 2009).

8.      Debtor Magellano Marine C.V. ("*Magellano*") is a special purpose Dutch entity, which is the "economic owner" of the Vessels pursuant to certain contractual arrangements. MPS indirectly owns 100 percent of the equity of Magellano – five percent through Seaarland and another 95% through an intermediate holding company named Poule B.V.

9.    An organizational chart showing the Debtor entities and non-debtor affiliates is attached hereto as ***Exhibit A***.

10.    The Vessels are regularly employed in international trade, and call on ports worldwide.  A chart showing each Vessel's class, flag, dwt and year built is attached hereto as ***Exhibit B***.

### Capital Structure of the Debtors

11.    As of July 29, 2011 (the "***Petition Date***"), the Debtors have prepetition secured indebtedness of approximately $207,408,791 (collectively, the "***Senior Debt***").  The Debtors' Secured Debt consists of the following:

> a.    Credit Agricole Facility: $89,743,838[2] outstanding under that certain loan agreement, dated as of September 22, 2005 (as amended, supplemented or otherwise modified as of the Petition Date, the "***Credit Agricole Credit Agreement***"), among MPS, the several lenders party thereto from time to time (the "***Credit Agricole Lenders***"), and Credit Agricole Corporate and Investment Bank ("***Credit Agricole***"), as agent; and

> b.    Royal Bank of Scotland Facility: $117,664,953[3] outstanding under that certain loan agreement, dated as of August 14, 2007 (as amended, supplemented or otherwise modified as of the Petition Date, the "***RBS Credit Agreement***"), among MPS, the several lenders party thereto from time to time (the "***RBS Lenders,*** and together with the Credit Agricole Lenders, the "***Senior Lenders***"), and Royal Bank of Scotland ("***RBS***"), as agent (and together with Credit Agricole, the "***Agents***")).

12.    The obligations under the Credit Agricole Credit Agreement are purportedly secured by mortgages on three of the Debtors' six ships.  These ships are: (i) M/T Montiron, a 115,000 dwt Aframax tanker built in 2003 by Sanoyas, Japan, registered under IMO number 9256860 (the "***Montiron***"); (ii) M/T Diana, a 38,500 dwt MR Product tanker built in 2005 by

---

[2] The above amount does not adjust for the Cash Sweep.  Of the $1,770,143.89 swept by Credit Agricole, the Debtors understand that only $1,210,475.09 was applied to the outstanding balance under the Credit Agricole Credit Agreement, with the remaining $559,668.80 used to pay Credit Agricole's fees and expenses.  Additionally, the foregoing amount includes $2,024,671outstanding in respect of an interest rate swap as of June 30, 2011.

[3] The above amount includes $17,100,453 outstanding in respect of an interest rate swap as of June 30, 2011.

Guangzhou S.Y. Int., China, registered under IMO number 9299496 (the "*Diana*"); and (iii) M/T Laura, a 113,000 dwt Aframax tanker built in January 2009 by New Times S.B., China, registered under IMO number 9417787 the (the "*Laura*", and together with the Montiron and the Diana, the "*Credit Agricole Collateral*").

13.     Additionally, under the terms of the Credit Agricole Credit Agreement, the Credit Agricole Lenders are secured in the cash intake accounts maintained for each of the Montiron (account number 00223202141), the Diana (account number 00223202335), and the Laura (account number 00227305920).   As discussed below, Credit Agricole swept these accounts prior to the commencement of these chapter 11 cases (the "*Credit Agricole Pledged Accounts*"). In addition to the Credit Agricole Pledged Accounts, Futmarine, the Debtors' non-debtor affiliate, also maintains two accounts with Credit Agricole (account numbers 00250740538 and 00250740635) holding approximately \$4.874 million and \$20,012.82, respectively (the "*Unrestricted Credit Agricole Accounts*"), representing proceeds from the sale of unfinished hulls.   Upon information and believe, the Debtors do not believe that the Unrestricted Credit Agricole Accounts are subject to any liens or security interests of any of the Credit Agricole Lenders.

14.     The obligations under the RBS Credit Agreement are purportedly secured by mortgages on the Debtors' remaining three ships, which are: (i) M/T Beth, a 38396 dwt oil/chemical tanker built in 2007 by Guangzhou Shipyard Int. Company, China, registered under IMO number 9374416 (the "*Beth*"); (ii) M/T Louise, a 73747 dwt oil tanker built in 2008 by New Century Shipbuilding Co., China, registered under IMO number 9417763 (the "*Louise*"); and (iii) M/T Meg, a 38396 dwt oil/chemical tanker built in 2007 by Guangzhou Shipyard Int.

Company, China, registered under IMO number 9340116 (the "***Meg***," and together with the Beth and the Louise, the "***RBS Collateral***").

15.     Further, under the terms of the RBS Credit Agreement, the RBS Lenders are purportedly secured in the cash intake accounts maintained for each of the Beth (account number 00362585), the Louise (account number 00384570), and the Meg (account number 00362615) (collectively, the "***RBS Pledged Accounts***").  As of the Petition Date, the RBS Pledged Accounts held $1,730,146.13.   In addition to the RBS Pledged Accounts, the Debtors maintain five accounts with RBS (account numbers 00436422, 00362607, 50029274, 00412833, and 00362534, collectively, the ("***Unrestricted RBS Accounts***" and together with the Unrestricted Credit Agricole Accounts, the "***Unrestricted Accounts***") holding approximately $1,099,193.17. Upon information and belief, the Debtors believe that one of these accounts (account number 00362607) holding approximately $567,671.79 was a cash intake account for a ship that had been pledged as collateral under the RBS Credit Agreement but had been sold to a third party. Consequently, upon the sale of this vessel, the Debtors believe that the account was similarly released from RBS's security interests.   The Debtors further believe that the remaining Unrestricted RBS Accounts represent general commercial accounts maintained by the Debtors with RBS and are not subject to any pledges under the RBS Credit Agreement.

**Events Leading to the Commencement of the Debtors' Chapter 11 Cases**

16.     The global vessel market fell into disarray in late 2008.  Due to the relatively high cost of chartered-in tonnage and low freight income, MPS was not able to perform under the guarantees issued for the performance of its chartering companies (Cargoship and Magellano). Beginning in the first quarter of 2010, the Debtors embarked on a process with their Senior Lenders, principally Credit Agricole, that the Debtors were led to believe would result in the

Credit Agricole Lenders' support for a medium to long-term restructuring plan (the "***Pre-Petition Restructuring Initiative***").  As part of this process, the Credit Agricole Lenders encouraged MPS to, among other things, cause its 50% owned non-debtor affiliate, Futmarine, to sell three ships under construction at a loss of majority of its equity investment of approximately $28 million.  On or about March 2011, Futmarine closed on the sale of these ships for approximately $10 million of net proceeds, of which MPS's share is approximately $5 million (the "***Futmarine Proceeds***").  These proceeds, however, remain in one of the Unrestricted Credit Agricole Accounts subject to attachment by Top Ships Inc.

17.     The Debtors were further encouraged to undertake an aggressive scheme to reduce their exposure where charter revenues were insufficient to cover costs.  This particular initiative was primarily effected by Cargoship and Magellano's early termination of out-of-the-money charters having an aggregate negative value of approximately $250 million (the "***Charter Settlements***").  Prior to the Petition Date, the Debtors paid approximately $11 million towards the retirement of these obligations.  In June 2011, after 18 months of extensive efforts to implement the Pre-Petition Restructuring Initiative, the Debtors believed that they were close to achieving their goals.  All that remained to be done was the completion of Charter Settlements with three of the Debtors' largest unsecured creditors.  To do so, the Debtors needed the new financing that Credit Agricole had led the Debtors to believe would be provided as part of the Pre-Petition Restructuring Initiative.

18.     On or about June 16, 2011, Credit Agricole delivered the Indicative Terms and Conditions setting forth the terms under which the Credit Agricole Lenders would agree to provide $4 million of new financing to fund the final Charter Settlements (the "***Credit Agricole Term Sheet***").  Shortly after receiving the Credit Agricole Term Sheet, the Debtors informed

#3829643

Credit Agricole that it believed that a total of $7 million, plus the Futmarine Proceeds, would be necessary to fund the remaining Charter Settlements. On June 22, 2011, Credit Agricole informed the Debtors that two of the prospective lenders would not have a decision on the new financing until June 27, 2011.

19. On July 19, 2011, following negotiations with the counter-parties to the remaining Charter Settlements, the Debtors informed Credit Agricole that they would now require new financing in the amount of $10 million. The Debtors' best efforts to consensually reorganize their Senior Debt began to unravel when the Debtors received Credit Agricole's counter-offer – the commencement of foreclosure proceedings against the Montiron. From there, events began to quickly spiral out of control for the Debtors. On July 21, 2011, a U.K. Admiralty Court granted Credit Agricole's motion to seize the Montiron. The vessel was arrested on July 21, 2011 by the Admiralty Marshal of the High Court in London who directed the vessel to remain under arrest in the Port of Coryton, U.K., where it remains today. Absent relief from this Court and/or parallel proceedings contemplated in the U.K., the Debtors believe that the Montiron will be sold in an inefficient judicial foreclosure proceeding in the U.K., which will fail to maximize the value of the vessel for the benefit of all creditors.

20. After the arrest of the Montiron, the Debtors reached an agreement in principle with their three main creditors to settle the Charter Settlements, upon which the Debtors asked Credit Agricole to fund $6.5 million in order to close and settle all of the Charter Settlement positions. Instead of receiving any counter-offer from Credit Agricole, things began to quickly unwind for the Debtors as Credit Agricole proceeded to issue a notice of repossession to the master of the Laura and the Diana. On the morning of July 29, 2011, the Debtors contacted Credit Agricole to continue the long-ongoing discussions regarding a consensual restructuring.

Immediately following their conference call, the Debtors received notice that Credit Agricole had swept nearly $1.8 million from the Debtors' bank accounts (the "***Cash Sweep***").  Credit Agricole's response to a consensual restructuring had been delivered.  Following the Cash Sweep, the Debtors were left with very few choices.  Rather than further expose the viability of their operations to the risks of an immediate seizure and quick sale of two of key sources of revenue, the Debtors commenced these chapter 11 cases on July 29, 2011 (the "***Commencement Date***").

## II.
## FIRST DAY MOTIONS

21.     Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings. I believe that, among other things, the relief requested in the First Day Pleadings is necessary to enable the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

**Administrative and Procedural Motions**

      **a.**      **Debtors' Motion for Entry of an Order Directing Joint Administration of their Related Chapter 11 Cases**

22.     The Debtors are seeking entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) (the "***Joint Administration Motion***"). Specifically, the Debtors are requesting that this Court maintain one file and one docket for all of the chapter 11 cases under the case caption *In re Marco Polo Seatrade B.V.*  Further, the Debtors are requesting that an entry be made on the docket of each of the chapter 11 cases of the Debtors other than *In re Marco Polo Seatrade B.V.* to indicate the joint administration of the chapter 11 cases.  The Debtors are also seeking authority to file the

monthly operating reports required by the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, issued by the U.S. Trustee, on a consolidated basis but intend to track and break out disbursements on a debtor-by-debtor basis.

23.     Given the integrated nature of the Debtors' businesses and the global breadth of its creditor body, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will be filed in these chapter 11 cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

24.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved by this Court.

**b.      Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 521 and Fed. Bankr. P. 1007(c) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs**

25.     The Debtors are seeking entry of an order granting additional time to file their schedules and statements of financial affairs (collectively, the "***Schedules and Statements***") for an additional 30 days, or 45 days from the Petition Date, without prejudice to the Debtors' right to request additional time if necessary (the "***Schedules and Statements Motion***").

26.     As set forth above, these chapter 11 cases were precipitated by the actions of Credit Agricole which sought to arrest the Debtors' vessels and swept the Debtors' accounts without any notice.  Consequently, the Debtors were forced to file these cases less than 24 hours after retaining counsel.  The scope and complexity of the Debtors' businesses, coupled with the limited time and resources available to the Debtors to gather the required information and prepare and file their respective Schedules and Statements, warrant an extension of the deadline to file the Schedules and Statements.

27.     I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be approved.

**c.      Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) File a Consolidated List of Creditors in Lieu of a Formatted Mailing Matrix, (II) File a Consolidated List of the Debtors' 20 Largest Unsecured Creditors and (III) Mail Initial Notices**

28.     The Debtors will propose to retain a notice and claims agent in connection with these chapter 11 cases who will prepare a computer-readable consolidated list of creditors available to all parties in interest.  Additionally, the Debtors seek authority to file a consolidated list of the Debtors' creditors holding the 20 largest unsecured claims.  Finally, the Debtors propose that the notice and claim agent undertake all mailing directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code, including, without limitation, the notice of commencement of these chapter 11 cases.

29.     I believe that permitting the Debtors to maintain a consolidated list of their creditors in electronic format only, in lieu of filing a creditor matrix, is warranted under the

-11-

circumstances of these chapter 11 cases. Converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents. The Debtors, working together with Kurtzman Carson Consultants LLC ("KCC"), the proposed notice and claims agent, are already in the process of preparing a single, consolidated list of the Debtors' creditors in electronic format. The Debtors are prepared to make that list available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a mailing matrix to the clerk of this Court.

30. Further, the Debtors submit that filing separate top 20 lists would be of limited utility because the top 20 lists of several of the Debtors would overlap, and certain other Debtors may have fewer than 20 identifiable unsecured creditors. In addition, the exercise of compiling separate top 20 creditor lists for each individual Debtor would consume an excessive amount of the Debtors' already scarce time and resources. I believe a single, consolidated list of the Debtors' 20 largest unsecured, non-insider creditors will be useful to the U.S. Trustee in its efforts to communicate with these creditors.

31. Finally, the Debtors propose that KCC undertake all mailings directed by the Court, the U.S. Trustee or as required by the Bankruptcy Code, including, without limitation, the notice of commencement of these chapter 11 cases. KCC's assistance with mailing and preparation of creditor lists and notices will ease administrative burdens that otherwise would fall upon the Court and the U.S. Trustee. With such assistance, I believe the Debtors will be prepared to file a computer-readable consolidated list of creditors and a list of equity security holders and also will be capable of undertaking all necessary mailings.

#3829643

**Operational Motions**

    **a.**      **Debtors' Motion for (I) Interim and Final Orders (A) Authorizing the Use of Cash Collateral and (B) Granting Adequate Protection; (II) a Final Protective Order With Respect to Certain Unencumbered Accounts; and (III) Scheduling a Final Hearing**

32.    The Debtors are seeking entry of (I) interim and final orders (a) authorizing the Debtors to use Cash Collateral on an interim basis pending a final hearing on the motion and (b) granting certain adequate protection to the Agents and the Senior Lenders in connection with the use of Cash Collateral; (II) a final protective order with respect to certain unencumbered accounts; and (III) prescribing the form and manner of notice and setting the time for the Final Hearing.

33.    The Debtors require immediate access to Cash Collateral on an interim basis. The Debtors' authorization to use Cash Collateral is critical to their ability to operate their businesses and preserve value. Without immediate liquidity provided by the use of Cash Collateral, the Debtors will likely be unable to conduct normal business operations. Specifically, the Debtors require use of cash collateral to pay critical vendors and avoid accrual of administrative expenses in connection with these chapter 11 cases.

34.    The operation of an international shipping fleet is extremely capital intensive. Any lapse in operation, no matter how transitory, could have a devastating economic impact on the going concern value of the Debtors' business, and jeopardize the safety of vessels and their crew. For example, the Debtors incur ongoing operating expenses related to navigating vessels on the high seas, which costs include crew costs, provisions, deck and engine stores, lubricating oils, insurance, maintenance and repairs, bunkers and port expenses. Absent the use of Cash Collateral, these expenses cannot be met and the sole income producing assets of the Debtors—

#3829643

the vessels—will be unable to sail and could possibly become subject to maritime liens and the threat of seizure at international ports.

35.     As of the Petition Date, the Debtors' Cash Collateral consisted of $1,730,146.134 maintained in the RBS Pledged Account.  For the Debtors to continue to operate their six wholly owned vessels, including the seized Montiron, the Debtors must have immediate access to their Cash Collateral.  The aggressive maneuvers by Credit Agricole left the Debtors with no time to prepare for these cases or seek alternative financing.

36.     The Debtors face "immediate and irreparable harm to the estate" absent the emergency consideration of the relief requested in this motion.  The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, postpetition operating expenses, as well as any court approved prepetition expenses that may be at issue. Without authority to use Cash Collateral, the Debtors will not be able to function as a going concern, and will not be able to proceed to consideration of a plan of reorganization. Accordingly, I believe authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses, which is unquestionably in the best interests of the Debtors, their estate and their creditors.

   **b.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Foreign Vendors, Service Providers and Governments, and Certain Critical Vendors, and (II) Authorizing Financial Institutions to Honor all Related Checks and Electronic Payment Requests**

37.     The Debtors are seeking entry of interim and final orders (I) authorizing, but not directing, the Debtors to pay the prepetition claims of certain Critical Vendors who supply goods or services essential to the Debtors' operations, and (II) authorizing banks and other financial

institutions to receive, process, honor and pay all checks and transfer requests evidencing amounts paid by the Debtors (the "***Critical Vendor Motion***").

38.     The Debtors estimate that the Critical Vendor payments will not exceed $1.2 million in the aggregate on an interim basis ("***Interim Critical Vendor Fund***") and $2 million in the aggregate on a final basis (the "***Final Critical Vendor Fund***").[4]  The Final Critical Vendor Fund represents less than one percent of the Debtors' aggregate debt obligations as of the Petition Date.  The Debtors contemplate making payments on prepetition Critical Vendor Claims that become payable postpetition in the ordinary course of their businesses as and when they become due.

39.     As described in more detail above, the Debtors rely in the ordinary course of business on the Critical Vendors to supply goods, materials and services without which the Debtors' business either could not operate or would operate at significantly reduced profitability. The Critical Vendors provide the Debtors with the following categories of goods and services:

   a.   <u>Agents' Expenses and Costs</u>.   Agents provide the crew with assistance in joining/signing off of the vessels.  Moreover, they arrange for necessary ship provisions and repairs, and organize the supply, transport and the handling of goods.  It is essential that the agents are paid so as not to disturb the smooth operations of the vessels worldwide.

   b.   <u>Port Expenses</u>.   Numerous port expenses are accrued by the vessels as they conduct their business throughout the world.  Pilotage, docking masters, towage, mooring, tugs, harbor dues, tonnage dues, etc. is incurred in ports world-wide.  It is essential that such foreign debts be paid in order to ensure the vessels can continue to conduct business in foreign ports of call.

   c.   <u>Lubes</u>.   Lube oil is crucial to the operation of the engine and most other mechanical functions on board the vessels.  The Debtors obtain lube oil through long-term relationships that offer significant volume discounts.  Any disruption to those relationships could have adverse economic consequences.

---

[4]     The Debtors reserve the right to seek to increase the Final Critical Vendor Fund at a later date if necessary, subject to this Court's approval.

#3829643

d. <u>Crew Costs</u>. Like most international shipping companies, the Debtors retain third party agents that employ and compensate the mostly foreign-born, highly skilled crew that work on their vessels. The Debtors cannot risk any impairment to their relationship with these foreign, third-party manning agents or crews.

e. <u>Cabin, Deck and Engine Stores.</u> Stores consist of materials necessary to keep the vessels operating. This may include communication systems, engineer's tools, chemicals, spare parts, safety equipment, cloth and linen products, rigging equipment, etc. Stores are often supplied by foreign vendors in close physical proximity to the vessels. Stores are of a specialized nature, which makes it imperative that relationships with these vendors are maintained.

f. <u>Bunkers</u>. Bunker fuel is liquid fuel which powers the Debtors' vessels. Bunker fuel is typically provided by foreign vendors because it is necessary for such vendors to be in close physical proximity to the vessels. It is essential to the locomotion of the vessels that the Debtors maintain healthy relationships with those vendors who provide them with bunker fuel.

g. <u>Maintenance and Repair</u>. It is essential that the vessels (*e.g.* engines, decks, communications equipment, radar, etc.) be maintained and repaired for safe and efficient operation. Vendors providing these services are typically foreign, as close physical proximity to the vessels is required.

40. Taken together, the nature of the prepetition claims of the Critical Vendors, the substantial harm to the Debtors' business that would be caused if those obligations are not honored and the related potential for loss of value in the Debtors' estates, all lead to the conclusion that the prepetition claims of the Critical Vendors fall well within the scope of obligations whose payment may be authorized, but not directed, pursuant to the doctrine of necessity and the other legal theories set forth above.

41. The Debtors further represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves and expected cash flows from ongoing business operations. Also, under the Debtors' existing Cash Management System, the Debtors represent that checks or wire transfer requests can be readily identified as relating to an authorized payment made to a Critical Vendor. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized

payments, will not be honored inadvertently and that all applicable financial institutions should be authorized, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Critical Vendor Claims.

42.     I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption and will ensure the value of the Debtors' businesses as a going concern are preserved during the pendency of these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendor Motion should be approved.

    **c.**    **Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Remit and Pay Certain Kinds of Taxes and Fees and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

43.     The Debtors request entry of interim and final orders granting the Debtors the authority to pay certain taxes and fees that accrued or arose in the ordinary course of business prior to the Petition Date, and requesting the financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the foregoing (the "***Tax Motion***").  In the ordinary course of business, the Debtors are required to remit wage taxes, which are advance taxes for personal income taxes due by their employees and which must be withheld by Dutch employers.  The Debtors are required to remit these taxes to the relevant Authorities on a monthly basis.  The Debtors are also, from time to time, required to pay fees at certain ports in various jurisdictions where their vessels dock.  The Debtors must continue to pay these taxes and fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases.  Specifically, it is my understanding that the Debtors' failure to

#3829643

pay the taxes and fees could adversely affect the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens or seek to lift the automatic stay.

44.     Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Tax Motion is in the best interests of the Debtor's estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.   Accordingly, on behalf of the Debtors, I respectfully submit that the Tax Motion should be approved.

**d.      Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing Use of Existing Cash Management System, Bank Accounts and Business Forms and (II) Waiving the Requirements of 11 U.S.C. § 345(b)**

45.     The Debtors request entry of interim and final orders authorizing the Debtors to continue using their existing cash management system, bank account and business forms and waiving the requirements of 11 U.S.C. § 345(b) (the "***Cash Management Motion***").

46.     In the ordinary course of business, the Debtors use an integrated, centralized Cash Management System to collect, transfer and disburse funds generated by their operations.  The Cash Management System is specifically tailored to meet the Debtors' current operating needs, enabling the Debtors to centrally control and monitor corporate funds and available cash, as well as to keep accurate balances and presentment information.

47.     If the Debtors were required to open separate accounts as debtors in possession and modify the Cash Management System in accordance with UST Guidelines, it would necessitate opening new accounts for collections, cash concentration and disbursements.  In fact, the Debtors would need to open dozens of new bank accounts increasing operating costs and negatively impacting the Debtors' cash flow.  Delays caused by the opening of the new accounts

would also negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

48.     I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into these chapter 11 cases by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition debts.  I believe that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have appropriate systems in place to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.  Ultimately, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estate and will enable the Debtors to operate their businesses in chapter 11 without disruption.

     **e.**     **Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue Prepetition Insurance Coverage and Related Practices**

49.     The Debtors request the entry of an order (a) authorizing the Debtors to continue insurance coverage entered into prepetition and to honor obligations thereunder, and to revise, supplement or change their insurance coverage by, among other things, entering into new insurance policies through renewal of the current policies or purchase of new policies and (b) authorizing the Debtors' financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing (the "***Insurance Motion***").

50.     I understand that as part of the effort to obtain comprehensive insurance coverage for the Debtors' operations in the most cost-effective manner, the Debtors maintain a brokerage agreement with both Cambiaso Risso Marine Spa and PL Ferrari (collectively, the "***Insurance Brokers***").  The Insurance Brokers assist the Debtors in obtaining comprehensive insurance

-19-

coverage for the Debtors' operations in the most cost-effective manner possible. In particular, the Insurance Brokers assist the Debtors with the procurement and negotiation of the Insurance Policies from Insurance Carriers, enabling the Debtors to obtain policies on advantageous terms and at competitive rates.

51.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

## III.
## LOCAL BANKRUPTCY RULE 1007-2 SCHEDULES

52.     Attached hereto and incorporated herein by this reference are various schedules setting forth information required pursuant to Local Bankruptcy Rule 1007-2. Capitalized terms used in the attached schedules that are not otherwise defined herein shall have the meanings ascribed to them in the preceding paragraphs of this Declaration. Specifically, the schedules attached hereto contain the following information with respect to the Debtors:[5]

    a.  <u>Schedule A(3)</u>: Schedule A(3) sets forth a list of any committee formed prepetition.

    b.  <u>Schedule A(4)</u>: Schedule A(4) sets forth a list of the names and addresses and, where available, the telephone numbers of the creditors holdings the 20 largest unsecured claims against the Debtors (on a consolidated basis), excluding insiders, and (where available) the name of the person familiar with the Debtors' account. This list also includes the amount of each claim and, if appropriate, an indication whether such claim is contingent, unliquidated, disputed or partially secured, subject to the Debtors' right to dispute the validity of any claims.

---

[5] The information contained in the schedules attached hereto shall not constitute and admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of such claim or debt. The descriptions of collateral securing the underlying obligations are intended only as brief summaries. Unless otherwise indicated, the financial information contained in the schedules is unaudited. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

c.  Schedule A(5): Schedule A(5) sets forth a list of the names and addresses of the creditors holding the five largest secured claims against the Debtors (on a consolidated basis).  This list also includes the amount of each claim, a brief description of the type of collateral securing the claim, and whether the claim or lien is disputed, subject to the Debtors' right to dispute the validity of any claims. The value of the collateral securing these claims remains undetermined.

d.  Schedule A(6): Schedule A(6) sets forth a summary of the assets and liabilities of the Debtors on a consolidated basis, as of the Petition Date, which has not been audited and is subject to change.

e.  Schedule A(7): Schedule A(7) lists the number and classes of shares of stock, debentures and other securities of the Debtors that are publicly held and the number of holders thereof.

f.  Schedule A(8): Schedule A(8) sets forth a list of the Debtors' property that is in possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor (other than Bank Accounts which may be subject to claims or setoff), or agent for any such entity.

g.  Schedule A(9): Schedule A(9) sets forth a list of the premises owned, leased or held under other arrangement from which the Debtors operate their business.

h.  Schedule A(10): Schedule A(10) sets forth a list of the locations of the Debtors' substantial assets and books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

i.  Schedule A(11): Schedule A(11) sets forth a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property, where a judgment against the Debtors or a seizure of their property may be imminent.

j.  Schedule A(12): Schedule A(12) sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

k.  Schedule B(1): Schedule B(1) sets forth a list identifying the estimated amount of the gross weekly payroll to employees (exclusive of officers and directors), for the 30 day period following the filing of the Debtors' chapter 11 petitions.

l.  Schedule B(2)(A): Schedule B(2)(A) sets forth a list identifying the estimated amount to be paid to officers, directors, stockholders, for the 30 day period following the filing of the Debtors' chapter 11 petitions.

m.  Schedule B(2)(C): Schedule B(2)(C) sets forth a list identifying the estimated amount to be paid to financial and business consultants retained by the Debtors, for the 30 day period following the filing of the Debtors' chapter 11 petitions.

#3829643

## IV.
## CONCLUSION

53.     To minimize the loss of any value to their business, the Debtors' immediate objective is to engage in business as usual following the commencement of these chapter 11 cases with as little interruption as possible.  If this Court grants the relief requested in the First Day Pleadings, the prospect of achieving this objective – to the maximum benefit of the Debtors' estates, creditor and parties in interest – will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New
York August 1, 2011

/s/*Barry Michel Cerneus*
Barry Michel Cerneus
Authorized Signatory

#3829643