Evan D. Flaschen (EF 6973)
Robert G. Burns (RB 0970)
Andrew J. Schoulder (AS 2018)
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, New York 10020
Telephone:	(212) 508 6100
Facsimile:	(212) 508 6101

Proposed Counsel for the Debtors and Debtors In Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**MARCO POLO SEATRADE B.V.,** *et al.*,[1]<br><br>Debtors. | **Chapter 11**<br><br>**Case No. 11-13634 (JMP)**<br><br>**(Joint Administration Requested)** |

**DEBTORS' MOTION FOR (I) INTERIM
AND FINAL ORDERS (A) AUTHORIZING THE USE
OF CASH COLLATERAL AND (B) GRANTING ADEQUATE
PROTECTION; (II) A FINAL PROTECTIVE ORDER WITH RESPECT TO CERTAIN
UNENCUMBERED ACCOUNTS; AND (III) SCHEDULING A FINAL HEARING**

Marco Polo Seatrade B.V. ("*Marco Polo*") and certain of its affiliates, as debtors and debtors in possession in the above captioned cases (collectively, the "*Debtors*"), by and through their undersigned proposed counsel, hereby file this Motion for (I) Interim and Final Orders (A) Authorizing the Use of Cash Collateral and (B) Granting Adequate Protection; (II) A Final Protective Order with respect to Certain Unencumbered Accounts; and (III) Scheduling a

---

[1] The Debtors in these chapter 11 cases (the "*Chapter 11 Cases*"), along with the last four digits of each Debtor's identification number, include: Marco Polo Seatrade B.V. (5584); Seaarland Shipping Management B.V. (0110); Magellano Marine C.V. (2910); and Cargoship Maritime B.V. (4361). The Debtors' service address is: Bracewell & Giuliani, LLP, 1251 Avenue of the Americas, 49th Floor, New York, NY 10020, Attn: Robert G. Burns.

Final Hearing (the "*Motion*"). In support of the Motion, the Debtors respectfully state as follows:

**Preliminary Statement**

1. The Debtors were forced to commence these Chapter 11 Cases and seek the Cash Collateral (as defined below) relief requested in this Motion by the same chain of events – the rapid and aggressive efforts by Credit Agricole, one of their senior lenders, to arrest half of the Debtors' vessel fleet in the days leading up to the Petition Date.[2] These acts of aggression ultimately came to a head on the morning of July 29, 2011, after the Debtors attempted to reach a consensual resolution with these same lenders. In response, Credit Agricole swiftly swept nearly $1.8 million from the Debtors' operating accounts (the "*Cash Sweep*"). The Debtors' options were crystallized at that moment. Rather than risk their fleet and the continued existence of their businesses, the Debtors elected to commence these Chapter 11 Cases several hours later.

2. Due to the accelerated nature of the events leading to the commencement of the Chapter 11 Cases, the Debtors had no time to approach the capital markets to obtain alternative financing. Compounding matters, the Cash Sweep stripped the Debtors of a significant portion of their working capital. For the Debtors to succeed, their fleet of tankers must continue to operate on the high seas without interruption. To achieve that, the Debtors must have access to their remaining Cash Collateral, as well as Cash Collateral generated from future receivables and other revenues. If deprived of their Cash Collateral, the Debtors will be unable to pay for the fuel that powers the vessels, to pay the crews that maintain and navigate them, to purchase the

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Declaration of Barry Michel Cerneus (I) in Support of Debtors' Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2 (the "*Cerneus Declaration*"), which has been filed contemporaneously herewith and is incorporated herein by reference.

parts and materials necessary to keep them sailing, and to provide for an extensive list of other items necessary for the operation of the Debtors' businesses. . If the Debtors are permitted to use their cash collateral, they estimate that it will enable them to generate monthly revenues of approximately $2.5 million, which they further estimate will be sufficient to operate the business and this restructuring case. However, every day that a single tanker is unable to operate, the Debtors move one step closer to being rendered incapable of surviving as a going concern.

### Relief Requested

3. By this motion, the Debtors request entry of an interim order (the "***Interim Cash Collateral Order***"), substantially in the form attached hereto as <u>Exhibit A</u>, and a final order (the "***Final Cash Collateral Order***," and together with the Interim Cash Collateral Order, the "***Cash Collateral Orders***"), (a) authorizing the Debtors to use Cash Collateral on an interim basis pending a final hearing on the motion (the "***Final Hearing***"); (b) granting certain adequate protection to the Agents and the Senior Lenders in connection with the use of Cash Collateral; (c) granting a protective order with respect to certain unencumbered accounts at the Final Hearing; and (d) prescribing the form and manner of notice and setting the time for the Final Hearing. The facts and circumstances supporting this Motion are set forth in the Cerneus Declaration.

### Concise Statement of the Material Terms of the Interim Cash Collateral Order

4. Pursuant to, and in accordance with, rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rule 4001-2(a) of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***") and General Order M-274 of the United States Bankruptcy Court for the Southern District of New York, the following is a

concise statement of the relief requested that lists or summarizes, and sets out the location within the Interim Cash Collateral Order of, all material provisions included therein:[3]

| **Material Term** | **Summary of Material Term** | **Provision** |
|---|---|---|
| Use: | For working capital and general corporate purposes and costs and expenses related to these Chapter 11 Cases, including, without limitation, any and all relief afforded by the Court pursuant to "first-day motions" or otherwise. | pg. 6. |
| Adequate Protection: | To the extent of the diminution in value of the Senior Lenders' interests in the totality of their prepetition collateral, from and after the Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code, resulting from the use, sale or lease by the Debtors of the Cash Collateral, the subordination of the Senior Lenders' liens in the Cash Collateral to the Carve-Out, and the imposition or enforcement of the automatic stay of section 363(a) (collectively, the "*Diminution in Value*"): <br><br> Credit Agricole Adequate Protection Liens. The Credit Agricole Lenders are hereby granted replacement security interests and liens (the "*Credit Agricole Adequate Protection Liens*") in and upon all of the Debtors' now owned and after-acquired cash, and cash collateral of the Debtors, any investment of such cash and cash collateral, accounts receivable, any right to payment whether arising before or after the Petition Date, and the proceeds, products, rents and profits of all of the foregoing prepetition and postpetition assets and properties (tangible, intangible, real, personal and mixed), whether now existing or newly acquired or arising, and wherever located, including, without limitation, all receivables and all cash ("*Cash Collateral*") (but excluding causes of actions and all avoidance actions arising under chapter 5 of the Bankruptcy Code ("*Avoidance Actions*")); provided that | pg. 7-9. |

---

[3] This summary is qualified in its entirety by the provisions of the Interim Cash Collateral Order. To the extent there are any conflicts between this summary and the Interim Cash Collateral Order, the terms of the Interim Cash Collateral Order shall govern.

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | such Credit Agricole Adequate Protection Liens shall only be granted to the extent the Credit Agricole Lenders would have been entitled to a security interest in such Cash Collateral under the Credit Agricole Credit Agreement. For the avoidance of doubt, as of the Petition Date, the Debtors have no interests in Cash Collateral arising under to the Credit Agricole Credit Agreement as a result of the Cash Sweep, subject to entry of the Protective Order (defined below) at the Final Hearing.<br><br>RBS Adequate Protection Liens. The RBS Lenders are hereby granted additional and replacement security interests and liens (the "***RBS Adequate Protection Liens***" and together with the Credit Agricole Adequate Protection Liens, the "***Adequate Protection Liens***") in and upon all of the Debtors' Cash Collateral (but excluding Avoidance Actions); provided that such RBS Adequate Protection Liens shall only be granted to the extent the RBS Lenders would have been entitled to a security interest in such Cash Collateral under the RBS Credit Agreement.<br><br>Credit Agricole 507(b) Claims. To the extent of any Diminution of Value of their interests granted in the Cash Collateral under the Credit Agricole Credit Agreement, the Credit Agricole Lenders are each hereby granted, in addition to claims under section 503(b) of the Bankruptcy Code, and subject to the Carve-Out, an allowed superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in each of the applicable cases (collectively, the "***Credit Agricole Adequate Protection Superpriority Claims***"), which shall at all times be payable from and have recourse to the Cash Collateral and proceeds thereof. For the avoidance of doubt, as of the Petition Date, Credit Agricole has no interests in Cash Collateral subject to the Credit Agricole Credit Agreement as a result of the Cash Sweep, subject to entry of the Protective Order (defined below) at the Final Hearing.<br><br>RBS 507(b) Claims. To the extent of any Diminution of Value of their interests granted in the Cash Collateral under the RBS Credit Agreement, the RBS Lenders are | |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | each hereby granted, in addition to claims under section 503(b) of the Bankruptcy Code, and subject to the Carve-Out, an allowed superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code in each of the applicable cases (collectively, the "***RBS Adequate Protection Superpriority Claims***" and together with the Credit Agricole Adequate Protection Superpriority Claims, the "***Adequate Protection Superpriority Claims***"), which shall at all times be payable from and have recourse to the Cash Collateral and proceeds thereof.<br><br>Burden of Proof. The Senior Lenders shall have the burden by motion, upon notice and a hearing, of demonstrating a Diminution in Value.<br><br>Adequate Protection Condition. The Adequate Protection Liens and Adequate Protection Superpriority Claims shall be valid only to the extent that the Senior Lenders' prepetition claims and liens exist, are valid, prior to all others, and not subject to defense, offset, avoidance or subordination (the "***Adequate Protection Condition***"). | |
| Reporting: | The Debtors shall provide the Senior Lenders, within 15 days following the end of each prior month, a monthly report containing the following information: (a) all receipts and disbursements of the Debtors; and (b) a reconciliation of actual receipts and disbursements with those set forth in the Budget on a line-by-line basis showing any variance to the proposed corresponding line item of the Budget. | pg. 10. |
| Carve-Out: | The term "***Carve-Out***" means the following items of expenses and fees that are accrued during the period covered by the Interim Order and the Budget: (a) the unpaid fees of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (b) the aggregate accrued and unpaid fees and expenses payable under Bankruptcy Code sections 330 and 331 to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee which may be appointed in the case, not to exceed the amounts permitted therefor in the Budget; and (c) $250,000 of funds to be in effect only if use of Cash Collateral is | pg. 10. |

| Material Term | Summary of Material Term | Provision |
|---|---|---|
| | terminated. | |

### Description of the Debtors' Prepetition Senior Indebtedness

5. As of the Petition Date, the Debtors have prepetition indebtedness, which is purportedly secured, of approximately $207,408,791 (collectively, the "***Senior Debt***"). The Debtors' Senior Debt consists of the following:

  a. Credit Agricole Facility: $89,743,838[4] outstanding under that certain loan agreement, dated as of September 22, 2005 (as amended, supplemented or otherwise modified as of the Petition Date, the "***Credit Agricole Credit Agreement***"), among MPS, the several lenders party thereto from time to time (the "***Credit Agricole Lenders***"), and Credit Agricole Corporate and Investment Bank ("***Credit Agricole***"), as agent; and

  b. Royal Bank of Scotland Facility: $117,664,953[5] outstanding under that certain loan agreement, dated as of August 14, 2007 (as amended, supplemented or otherwise modified as of the Petition Date, the "***RBS Credit Agreement***"), among MPS, the several lenders party thereto from time to time (the "***RBS Lenders***, and together with the Credit Agricole Lenders, the "***Senior Lenders***"), and Royal Bank of Scotland ("***RBS***"), as agent (and together with Credit Agricole, the "***Agents***").

6. The obligations under the Credit Agricole Credit Agreement are purportedly secured by mortgages on three of the Debtors' six ships. These ships are: (i) M/T Montiron, a 115,000 dwt Aframax tanker built in 2003 by Sanoyas, Japan, registered under IMO number 9256860 (the "***Montiron***"); (ii) M/T Diana, a 38,500 dwt MR Product tanker built in 2005 by Guangzhou S.Y. Int., China, registered under IMO number 9299496 (the "***Diana***"); and (iii) M/T Laura, a 113,000 dwt Aframax tanker built in January 2009 by New Times S.B., China,

---

[4] The above amount does not adjust for the Cash Sweep. Of the $1,770,143.89 swept by the Credit Agricole Agent, the Debtors understand that only $1,210,475.09 was applied to the outstanding balance under the Credit Agricole Credit Agreement, with the remaining $559,668.80 used to pay the Credit Agricole Agent's fees and expenses. Additionally, the foregoing amount includes $2,024,671 outstanding in respect of an interest rate swap as of June 30, 2011.

[5] The above amount includes $17,100,453 outstanding in respect of an interest rate swap as of June 30, 2011.

registered under IMO number 9417787 the (the "*Laura*", and together with the Montiron and the Diana, the "*Credit Agricole Collateral*").

7. Additionally, under the terms of the Credit Agricole Credit Agreement, the Credit Agricole Lenders are purportedly secured in the cash intake accounts maintained for each of the Montiron (account number 00223202141), the Diana (account number 00223202335), and the Laura (account number 00227305920) (the "*Credit Agricole Pledged Accounts*"). As discussed below, Credit Agricole swept these accounts prior to the commencement of these Chapter 11 Cases. In addition to the Credit Agricole Pledged Accounts, Futmarine, the Debtors' 50% owned non-debtor affiliate, also maintains two accounts with Credit Agricole (account numbers 00250740538 and 00250740635) holding approximately $4.874 million and $20,012.82, respectively (the "*Unrestricted Credit Agricole Accounts*"), representing proceeds from the sale of unfinished hulls. Upon information and belief, the Debtors do not believe that the Unrestricted Credit Agricole Accounts are subject to any liens or security interests of any of the Credit Agricole Lenders.

8. The obligations under the RBS Credit Agreement are purportedly secured by mortgages on the Debtors' remaining three ships, which are: (i) M/T Beth, a 38,396 dwt oil/chemical tanker built in 2007 by Guangzhou Shipyard Int. Company, China, registered under IMO number 9374416 (the "*Beth*"); (ii) M/T Louise, a 73,747 dwt oil tanker built in 2008 by New Century Shipbuilding Co., China, registered under IMO number 9417763 (the "*Louise*"); and (iii) M/T Meg, a 38,396 dwt oil/chemical tanker built in 2007 by Guangzhou Shipyard Int. Company, China, registered under IMO number 9340116 (the "*Meg*," and together with the Beth and the Louise, the "*RBS Collateral*").

9. Further, under the terms of the RBS Credit Agreement, the RBS Lenders are purportedly secured in the cash intake accounts maintained for each of the Beth (account number 00362585), the Louise (account number 00384570), and the Meg (account number 00362615) (collectively, the "***RBS Pledged Accounts***"). As of the Petition Date, the RBS Pledged Accounts held $1,730,146.13. In addition to the RBS Pledged Accounts, the Debtors maintain five accounts with RBS (account numbers 00436422, 00362607, 50029274, 00412833, and 00362534; (collectively, the "***Unrestricted RBS Accounts***" and together with the Unrestricted Credit Agricole Accounts, the "***Unrestricted Accounts***"), holding approximately $1,099,193.17. Upon information and belief, the Debtors believe that one of these accounts (account number 00362607) was a cash intake account for a ship that had been pledged as collateral under the RBS Credit Agreement but previously sold to a third party. Consequently, upon the sale of this vessel, the Debtors believe that the account was similarly released from RBS's security interests, if any. The Debtors further believe that the remaining Unrestricted RBS Accounts represent general commercial accounts maintained by the Debtors with RBS and are not subject to any pledges under the RBS Credit Agreement.

### Events Leading to the Commencement of the Chapter 11 Cases

10. As discussed in greater detail in the Cerneus Declaration, over the course of the past eighteen months, the Debtors have been negotiating in good faith to restructure their loans with Credit Agricole and RBS. Beginning in the first quarter of 2010, the Debtors embarked on a process with their Senior Lenders, principally Credit Agricole, that the Debtors were led to believe would result in the Credit Agricole Lenders' support for a medium to long-term restructuring plan (the "***Pre-Petition Restructuring Initiative***"). As part of this process, the Credit Agricole Lenders encouraged MPS to, among other things, cause its 50% owned non-debtor affiliate, Futmarine, to sell three ships under construction at a loss of majority of its equity

investment of approximately $28 million. On or about March 2011, Futmarine closed on the sale of these ships for approximately $10 million of net proceeds, of which MPS's share is approximately $5 million (the "**Futmarine Proceeds**"). These proceeds, however, remain in one of the Unrestricted Credit Agricole Accounts subject to attachment by Top Ships Inc.

11. The Debtors were further encouraged to undertake an aggressive scheme to reduce their exposure where charter revenues were insufficient to cover costs. This particular initiative was primarily effected by Cargoship and Magellano's early termination of out-of-the money charters having an aggregate negative value of approximately $250 million (the "**Charter Settlements**"). Prior to the Petition Date, the Debtors paid approximately $11 million towards the retirement of these obligations. In June 2011, after 18 months of extensive efforts to implement the Pre-Petition Restructuring Initiative, the Debtors believed that they were close to achieving their goals. All that remained to be done was the completion of Charter Settlements with three of the Debtors' largest unsecured creditors. To do so, the Debtors needed the new financing that Credit Agricole had led the Debtors to believe would be provided as part of the Pre-Petition Restructuring Initiative.

12. On or about June 16, 2011, Credit Agricole delivered an Indicative Terms and Conditions setting forth the terms under which the Credit Agricole Lenders would agree to provide $4 million of new financing to fund the final Charter Settlements (the "**Credit Agricole Term Sheet**"). Shortly after receiving the Credit Agricole Term Sheet, the Debtors informed Credit Agricole that it believed that a total of $7 million, plus the Futmarine Proceeds, would be necessary to fund the remaining Charter Settlements. On June 22, 2011, Credit Agricole informed the Debtors that two of the prospective lenders would not have a decision on the new financing until June 27, 2011.

13. On July 19, 2011, following negotiations with the counter-parties to the remaining Charter Settlements, the Debtors informed Credit Agricole that they would now require new financing in the amount of $10 million. The Debtors' best efforts to consensually reorganize their Senior Debt began to unravel on June 27, 2011, when the Debtors received Credit Agricole's counter-offer – the commencement of foreclosure proceedings against the Montiron. From there, events began to quickly spiral out of control for the Debtors. On July 21, 2001, a U.K. Admiralty Court granted Credit Agricole's motion to seize the Montiron. The vessel was arrested on July 21, 2011, by the Admiralty Marshal of the High Court in London who directed the vessel to remain under arrest in the Port of Coryton, U.K., where it continues to be idle today. Absent relief from this Court and/or parallel proceedings contemplated in the U.K., the Debtors believe that the Montiron will be sold in an inefficient judicial foreclosure proceeding in the U.K., which will fail to maximize the value of the vessel for the benefit of all creditors.

14. After the arrest of the Montiron, the Debtors reached an agreement in principle with their three main creditors to settle the Charter Settlements, upon which the Debtors asked Credit Agricole to fund $6.5 million in order to close and settle all of the Charter Settlement positions. Instead of receiving any counter-offer from Credit Agricole, things began to quickly unwind for the Debtors as Credit Agricole proceeded to issue a notice of repossession to the master of the Laura and the Diana. On the morning of July 29, 2011, the Debtors contacted Credit Agricole to continue the long-ongoing discussions regarding a consensual restructuring. Immediately following their conference call, the Debtors received notice that Credit Agricole had swept nearly $1.8 million from the Debtors' bank accounts. Credit Agricole's response to a consensual restructuring had been delivered. Following the Cash Sweep, the Debtors were left with very few choices. Rather than further expose the viability of their operations to the risks of

an immediate seizure and quick sale of two of its key sources of revenue, the Debtors commenced these Chapter 11 Cases.

I.  **The Debtors' Urgent Need to Use Cash Collateral**

15. The operation of an international shipping fleet is extremely capital intensive. Any lapse in operation, no matter how transitory, could have a devastating economic impact on the going concern value of the Debtors' business, and jeopardize the safety of vessels and their crew. For example, the Debtors incur ongoing operating expenses related to navigating vessels on the high seas, which costs include crew costs, provisions, deck and engine stores, lubricating oils, insurance, maintenance and repairs, bunkers and port expenses. Absent the use of Cash Collateral, these expenses cannot be met and the sole income producing assets of the Debtors—the vessels—will be unable to sail. The vessels could also possibly become subject to maritime liens and the threat of seizure at international ports.

16. As of the Petition Date, the Debtors' Cash Collateral consisted of $1,730,146.43 maintained in the RBS Pledged Account. For the Debtors to continue to operate their six wholly owned vessels, including the seized Montiron, the Debtors must have immediate access to their Cash Collateral. The aggressive maneuvers by Credit Agricole left the Debtors with no time to prepare for these cases or seek alternative financing.

17. Accordingly, the Debtors face "immediate and irreparable harm to the estate" absent the emergency consideration of the relief requested in this motion. The immediate use is necessary, and it will stabilize the Debtors' operations and revenue by paying ordinary, postpetition operating expenses, as well as any court approved prepetition expenses that may be at issue. Without authority to use Cash Collateral, the Debtors will not be able to function as a going concern, and will not be able to proceed to consideration of a plan of reorganization.

Accordingly, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses, which is unquestionably in the best interests of the Debtors, their estate and their creditors.

## **Supporting Authority**

    a.    The Debtors' Request to Use Cash Collateral
           and the Proposed Adequate Protection Is Appropriate

18.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or court approval. Specifically, section 363(c)(2) states in pertinent part:

> The trustee [or debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

19.    Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

20. What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, (Bankr. LEXIS 2456. *4 (Bankr, D. Del. Feb. 18, 1992); *see also In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992). Through adequate protection, the Bankruptcy Code attempts to shield a secured creditor from diminution in the value of its interest in its collateral while it is being used by a debtor. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

21. As summarized in the table above and detailed in the Interim Order, to protect against Diminution in Value, if any, resulting from the Debtors' use of the Cash Collateral, the subordination of the Senior Lenders' alleged liens in the Cash Collateral to the Carve-Out, and the imposition or enforcement of the automatic stay, the Debtors propose to provide the Senior Lenders to the extent of the Diminution in Value, the Adequate Protection Liens and the 507(b) Claims, subject, in each case, to (i) the Adequate Protection Condition and (ii) the need for the Senior Lenders to demonstrate by motion, upon notice and a hearing, a Diminution in Value.

22. Based on average year-to-date, pre-petition revenues, with access to all six vessels and access to the Cash Collateral, the Debtors generated revenues of $83,000 per day. Assuming the Debtors obtain access to their Cash Collateral, and based on this pre-petition average, the Debtors could generate at least $30 million on an annualized basis, against annualized operating expenses of approximately $13 million. These increased cash flows will further insulate the Senior Lenders from Diminution in Value, if any, and enable the Debtors to maintain the going concern value of the Senior Lenders' collateral. Given the current market conditions for the sale of tankers such as those owned by the Debtors, the continuation of the Debtors' operations likely

presents the best opportunity for the Senior Lenders to receive the greatest recovery on account of their claims. The Debtors' business, as a going concern, has a value far in excess of any value that might be obtained in a chapter 7 liquidation. A complete shutdown of the Debtors' business, even for a short period, would result in the loss of employees, while also diminishing the recoveries creditors and equity holders would receive if the enterprise where allowed to continue to operate as a going concern. Accordingly, it is imperative that a preliminary hearing be set immediately.

23. Based on the foregoing, the Debtors submit that use of the Cash Collateral will allow the Debtors to continue their operations and thereby protect the Senior Lenders' interests. Courts have consistently recognized that the preservation of the going concern value of secured lenders' collateral constitutes adequate protection of such creditors' interest in the collateral. *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if there is no actual diminution of value of collateral and the debtor can operate profitably postpetition, then the secured creditor is adequately protected); *In re 499 W. Warren St. Assocs., Ltd. P'ship,* 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (finding a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Stein,* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditors' secured position would be enhanced by the continued operation of the debtors' business); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

24. As additional adequate protection, the Debtors will provide the Senior Lenders, within 15 days following the end of each prior month, a monthly report containing the following information: (a) all receipts and disbursements of the Debtors; and (b) a reconciliation of actual receipts and disbursements with those set forth in the Budget on a line-by-line basis showing any variance to the proposed corresponding line item of the Budget.

25. For the reasons discussed above, the Debtors believe that the proposed Adequate Protection to be provided for the benefit of the Senior Lenders is appropriate and necessary under the circumstances to ensure the Debtors are able to continue using Cash Collateral for the benefit of all parties in interest. Accordingly, the adequate protection proposed herein and in the Cash Collateral Orders is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

    b. <u>The Debtors' Interim Use of Cash Collateral Should be Approved</u>

26. Pursuant to Bankruptcy Rule 4001(b), a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after service of such motion. Upon request, however, the Court is authorized to conduct a preliminary expedited hearing before the expiration of the 14-day period to authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

27. As explained above, without access to the Cash Collateral, the Debtors will not be able to fund their payroll obligations, satisfy payments to customers and vendors that are necessary for operations to continue uninterrupted and to avoid the imposition of maritime liens. Simply, the Debtors will not be able to operate their businesses.

28. For the reasons set forth in this Motion and the facts cited in the Cerneus Declaration, the Debtors seek immediate authority to use the Cash Collateral pursuant to the

terms and conditions in the Interim Cash Collateral Order to prevent immediate and irreparable harm to the Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).

II.     **A Protective Order is Necessary to Access Unrestricted Accounts**

29.     The Debtors are requesting the entry of a protective order finding that the Unrestricted Accounts are not subject to the liens of the Debtors' Senior Lenders (the "***Protective Order***"). Section 105(a) of the Bankruptcy Code provides this Court with the authority to issue any order that is necessary or appropriate to carry out the provisions of title 11. The Debtors believe that the Protective Order is vital to their ability to effectively reorganize.

30.     As mentioned above, the Unrestricted Credit Agricole Accounts hold approximately $5 million of proceeds that the Debtors believe are property of the estates. The Unrestricted RBS Accounts hold $1,099,193.17 of cash that is also property of the Debtors' estates. Based on information currently available to them, the Debtors believe that these Unrestricted Accounts and the funds contained therein are not subject to any liens of their Senior Lenders. However, in light of the events leading up to the Petition Date, especially those involving Credit Agricole's agressiveness, the Debtors are requesting the entry of the Protective Order out of an abundance of caution to avoid exposing their estates to unnecessary risks.

31.     To insure that the Senior Lenders have a fair opportunity to review and respond to the Debtors' request for the Protective Order, the Debtors are not requesting that the Court consider this request for relief until the Final Hearing. In the event that either of the Senior Lenders are able to establish at the Final Hearing that one or both of the Unrestricted Accounts are part of their Cash Collateral, the Debtors request that the funds in these accounts be included in the Cash Collateral relief sought by this Motion.

## Request for Final Hearing

32. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a Final Hearing on the Motion as soon as practicable, but in no event later than 45 days following the entry of the Interim Cash Collateral Order, and fix the time and date for parties to file objections to the motion in advance of such Final Hearing.

### Jurisdiction

33. Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), the Court has jurisdiction to consider and grant the relief requested herein. A proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

34. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

### Motion Practice

35. The Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion. In addition to all entities otherwise entitled to receive notice, the Debtors have given notice of this motion to all entities believed to have or be claiming an interest in the subject matter of the proposed order or who, it is believed, otherwise would be affected by the proposed order. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1.

### Notice

36. No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. The Debtors have provided notice of this motion to: (a) the Office of the United States

Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) the Agents and their counsel (if known); and (d) the Internal Revenue Service.  The Debtors respectfully submit that no other or further notice need be provided.

**<u>No Prior Request</u>**

37. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

| | |
|---|---|
| New York, New York<br>Dated: August 1, 2011 | /s/ Robert G. Burns<br>Robert G. Burns<br>Robert.Burns@bgllp.com<br>Andrew J. Schoulder<br>Andrew.Schoulder@bgllp.com<br>BRACEWELL & GIULIANI LLP<br>1251 Avenue of theAmericas<br>Telephone:(212) 508-6100<br>Facsimile: (212) 508-6101<br><br>Evan Flaschen<br>Evan.Flaschen@bgllp.com<br>Mark Dendinger<br>Mark.Dendinger@bgllp.com<br>Telephone: (860) 947-9000<br>Facsimile: (860) 246-3201<br><br>Proposed Counsel for the Debtors<br>and Debtors in Possession |