Alfred E. Yudes, Jr. (AEY-4152)
Jane Freeberg Sarma (JMF-5473)
WATSON, FARLEY & WILLIAMS (New York) LLP
1133 Avenue of the Americas, 11th Floor
New York, New York 10036
Telephone:   (212) 922-2200
Facsimile:   (212) 922-1512
Counsel for Credit Agricole

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MARCO POLO SEATRADE B.V., et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-13634 (JMP)<br><br>(Joint Administration Requested) |

## CREDIT AGRICOLE'S OBJECTION TO DEBTORS' MOTION FOR THE USE OF CASH COLLATERAL

Credit Agricole Corporate and Investment Bank, as Agent, Security Trustee, Swap Bank and Issuing Bank ("Credit Agricole") pursuant to the Loan Agreement dated September 22, 2005 (the "Loan Agreement") made between Marco Polo Seatrade B.V. ("Borrower" or "Borrower Debtor"), Credit Agricole and the Banks and Financial Institutions listed in Schedule 1 to the Loan Agreement, as Amended and Restated on August 1, 2006 and Supplemented on July 16, 2010 objects to Debtors' Motion for the Use of Cash Collateral and questions the jurisdiction of the Court over these proceedings.

### STATEMENT

1.   Pursuant to the Loan Agreement, and as here today relevant, Credit Agricole held first preferred shipmortgages over Borrower Debtors' vessels MONTIRON, DIANA and LAURA. Additionally, Borrower Debtor and Debtor Magellano Marine

---

[1] The Debtors in these chapter 11 cases (the "*Chapter 11 Cases*"), along with the last four digits of each Debtor's identification number, include:  Marco Polo Seatrade B.V. (5584); Seaarland Shipping Management B.V. (0110); Magellano Marine C.V. (2910); and Cargoship Maritime B.V. (4361).

C.V. pledged certain Earnings Accounts and a Retention Account, as described in the Loan Agreement, to Credit Agricole.

2. These Bankruptcy Proceedings are a sham perpetrated by these Dutch Debtors, who have no actual connection with this jurisdiction, to harass Credit Agricole and attempt to thwart its ability to realize on its secured interest in its collateral. Credit Agricole had, prior to the filing of these Bankruptcy Petitions, already effectuated the execution of these collateral security rights.[2]

3. Having been granted a moratorium on repayment of loan principal for much of 2010, on December 29, 2010, Borrower Debtor failed to repay $600,000 in respect of the second tranche of the Loan, $480,000 for the fourth tranche and $807,500 in respect of the fifth tranche, totalling $1,887,500.

4. Thereafter, Debtors failed to repay three quarterly repayments on December 29, 2010, March 29, 2011 and June 29, 2011 in the total amounts of $2,000,000, $1,600,000 and $2,691,666.67 respectively.

5. Further on June 29, 2011, Debtors failed to repay $600,000, $180,000 and $807,000 due on the second, fourth and fifth tranche of the Loan, totalling $1,587,000.

6. Prior to this Bankruptcy, on July 27, 2011, Credit Agricole notified Debtors of its default and accelerated the Loan, so that the then outstanding principal amount of $87,719,166.67, plus all accrued interest thereon and other amounts accruing or owed under the Loan Agreement were immediately due and payable.

7. Prior to this Bankruptcy, on July 21, 2011, Credit Agricole arrested MONTIRON in Croyton, U.K. to foreclose its mortgage.

---

[2] Due to time constraints, this document is not, nor is it intended to be, a full statement of Credit Agricole's position, rights and remedies.

8. Prior to this Bankruptcy, on July 21, 2011 and July 27, 2011, Credit Agricole took possession of LAURA and DIANA, then at sea, by issuing notice of its repossession of each of the Vessels and its exercise of its rights as mortgagee-in-possession. Unfortunately, Debtors have interfered with Credit Agricole's lawful exercise of its rights by instructing the Vessels' masters not to follow Credit Agricole's lawful instructions.

9. On July 28, 2011, Credit Agricole terminated the ISDA Swap Master Agreement position, for which Borrower Debtor now owes Credit Agricole $2,165,500, and swept the cash out of the Retention and Earnings accounts it held as part of its security package.

10. All of the foregoing was done and completed prior to the Bankruptcy Petitions being filed herein.

## CASH COLLATERAL USE

11. With almost $19 million in unsecured debt, over $10 million of which is trade debt (Schedule A(4)), Debtors gave no indication how the use of about $1.7 million (Motion ¶9) will alleviate its circumstances. The trade debt is especially important because these creditors likely have maritime claims that could lead to the arrest or attachment of the vessels by creditors not subject to the jurisdiction of this Court.

12. Debtors do not disclose that on June 28, 2011, a company named Top Ships obtained a court order for the arrest of LAURA in Savona, Italy, putting Credit Agricole's security at risk. This demonstrates that the market has lost confidence in Debtors, and was a significant factor in Credit Agricole's decision to exercise its collateral security rights. The market is not going to risk the delay of cargoes easily worth $30 million (carried by the Product Tankers) or $60 million (carried by the Aframax Tankers) on vessels subject to arrest.

19129383 v1

13. Not included is the unsecured creditors' schedule, but Debtors have not been paying the crews of the vessels in a prepetition amount of $609,843. Crewmen have the highest ranking maritime lien against the Vessels in most jurisdictions.

14. Debtors blithely state that "all six" of the vessels, despite the fact three have been arrested or repossessed, will eventually generate revenue of $83,000 per day, but not how since one is under arrest and not all are employed.

15. Also, for Adequate Protection, Debtors are offering Credit Agricole priority over assets "to the extent the Credit Agricole Lenders would have been entitled to a security interest on such Cash Collateral under the Credit Agricole Credit Agreement." This is ephemeral. Credit Agricole is being offered security over assets on which it already has a security interest.

## CONCLUSION

Debtors have not borne their burden of showing Credit Agricole is adequately protected. 11 U.S.C.§§361, 363(p)(1), see, In re Polzin, 49 B.R. 370, 371-72 (Bankr. D. Minn. 1985) ("It is Debtor's burden to demonstrate that the secured party is adequately protected.")

There are open issues whether sufficient controls have been established to assure only the essential use of the Cash Collateral for intended purposes, and the Cash Collateral budget is so sketchy and for such a short period it is of no help.

Debtors no longer have the right to the Vessels upon which Credit Agricole has effected its security interests by arrest or repossession.

Debtors have not established the jurisdiction of this Court.

For all of these reasons, the Motion for the Use of Cash Collateral should be denied.

4

Dated: August 2, 2011
New York, New York

        WATSON, FARLEY & WILLIAMS (NEW YORK) LLP

By: _/s/ Alfred E. Yudes, Jr._
Alfred E. Yudes, Jr. (AEY-4152)
Jane Freeberg Sarma (JMF-5473)
1133 Avenue of the Americas, 11th Floor
New York, New York 10036
Tel.: (212) 922-2200
Fax: (212) 922-1512

*Attorneys for Defendants Credit Agricole*