Evan D. Flaschen (EF 6973)
Robert G. Burns (RB 0970)
Andrew J. Schoulder (AS 2018)
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, New York 10020
Telephone:      (212) 508 6100
Facsimile:       (212) 508 6101

Proposed Counsel for the Debtors and Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:**<br><br>**MARCO POLO SEATRADE B.V.**, *et al.,*[1]<br><br>    **Debtors.** | **Chapter 11**<br><br>**Case No. 11-13634 (JMP)**<br><br>**Jointly Administered** |

**MOTION FOR ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN**
**POSTPETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION,**
**(III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (together, the "***Debtors***"), by and

through their undersigned proposed counsel, hereby file this motion (the "***Motion***") for entry of

an order, pursuant to sections 105, 361, 362, and 364 of title 11 of the United States Code, 11

U.S.C. §§ 101, et seq. (the "***Bankruptcy Code***"), rules 2002, 4001, and 9014 of the Federal Rules

of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and rule 4001-2 of the Local Bankruptcy

Rules for the Southern District of New York (the "***Local Rules***"), (i) authorizing the Debtors, on

---

[1] The Debtors in these chapter 11 cases (the "***Cases***"), along with the last four digits of each Debtor's identification number, include: Marco Polo Seatrade B.V. ("***MPS***") (5584); Seaarland Shipping Management B.V. (0110); Magellano Marine C.V. (2910); and Cargoship Maritime B.V. (4361).  The Debtors' service address is: Bracewell & Giuliani, LLP, 1251 Avenue of the Americas, 49th Floor, New York, NY 10020, Attn: Robert G. Burns.

an interim basis, to (a) obtain postpetition financing of up to $2,400,000 on a senior secured, priming, superpriority basis, (b) grant the Prepetition Lenders (as defined herein) adequate protection in connection therewith, (c) scheduling a hearing to consider entry of the Final DIP Order (as defined below), (d) granting related relief and (ii) authorizing, on a final basis, (a) the Debtors to obtain postpetition financing up to a total of $4,800,000 (in the aggregate with the interim financing relief) on a senior secured, priming, superpriority basis, and (b) the relief granted in the Interim Order as described in the Motion. In support thereof, the Debtors submit the Declaration of Barry Michel Cerneus in support of the Motion, which is incorporated herein by reference. In further support thereof, the Debtors would show as follows:

## PRELIMINARY STATEMENT

When the Debtors commenced these Cases on July 29, 2011 (the "***Petition Date***"), they did so with the flagship vessel of their fleet in arrest in the United Kingdom, and their bank accounts depleted after being swept by the bank agent. The loss of this profitable vessel, and a significant amount of working capital – together with a vessel at sea running out of food, fuel and fresh water – left the Debtors with no choice but to seek the protection of this Court. The four weeks following the Petition Date have demonstrated that the Debtors' ability and determination to stabilize and reorganize their businesses through Chapter 11 has already begun to bear fruit. These four weeks have also demonstrated why the Debtors require debtor in possession financing to capitalize on business opportunities that will drive a successful restructuring.

Of the Debtors' six vessels, four ships continue to generate revenue on a daily basis under pooling agreements, with the remaining pool ship – the M/T Montiron – still under arrest. While the continued trading of these "pool ships" is reassuring, the most telling measure of the Debtors' successful transition into Chapter 11 is the continuous employment of the M/T Laura. This

vessel operates on a "spot basis," which means that the Debtors are responsible for marketing the vessel, procuring charters, and pre-funding all of the significant expenditures necessary to complete a voyage. Less than twelve hours after the conclusion of the emergency Cash Collateral hearing on August 2, the Debtors procured a profitable charter for the Laura, a clear demonstration that the shipping industry had not abandoned the Debtors despite inferences to the contrary at the emergency first day hearing. Even before the Laura completed its initial post-Chapter 11 voyage, it was chartered for a second voyage, this one a short-term trip from Skikda, Algeria to Tarragona, Spain.

Therefore, when an internationally recognized oil company proposed a new long term charter for the Laura on the evening of Thursday, August 18, 2011, the Debtors were further encouraged that despite these Chapter 11 proceedings, the shipping industry continued to perceive the Debtors as viable participants in the marketplace. This new voyage would have generated significant revenues and a considerable net profit of up to $700,000 (the "***Laura Voyage***").

The opportunity to undertake the Laura Voyage exemplifies both why postpetition financing is necessary and the consequences of it not being made available. To undertake this profitable voyage, the Debtors needed immediate access to approximately $2 million to pre-fund fuel costs, port costs, strait and canal transit fees, and insurance premiums over a six-week period. This posed a significant issue: the Debtors did not have sufficient Credit Agricole Cash Collateral to fund the entirety of these costs.

Given the prospect of a very profitable voyage, early on August 19, 2011, the Debtors approached Credit Agricole to request its assistance to facilitate this business transaction with an advance to fund the Laura Voyage, which the Debtors firmly believed would benefit both the

Debtors and each of RBS and Credit Agricole.[2]  As is typical in the Debtors' business, the offer required confirmation of their acceptance of the Laura Voyage on a quick turnaround basis.  The Debtors waited until the morning of Monday, August 22, 2011.  While it was clear to the Debtors that Credit Agricole was working in good faith to consider the proposal and provide a response, the Debtors' confirmation deadline was rapidly approaching.  The Debtors determined it would ultimately be in their best interest to confirm their availability to undertake the Laura Voyage and seek postpetition financing as an alternate means of funding the voyage (the Debtors also continued to work with Credit Agricole on prefunding the voyage).[3]  Even by then, the probability of being awarded the voyage was jeopardized as the delay provided the charterer with an opportunity to explore other competing vessels.  Due in part to the Debtors' delayed response and the charterer's shaken confidence in the Debtors' ability to prefund the voyage, on August 25, 2011, the charterer advised the Debtors that it would not be hiring the Laura.

It is the Debtors' business judgment that in order to prevent such a significant loss of business in the future, the Debtors require access to inexpensive capital and operational flexibility that only the debtor in possession financing proposed herein can provide.

The Debtors have been able to acquire postpetition financing on favorable terms from Futmarine, B.V., a non-debtor joint venture 50% owned by MPS, whose only assets are two unencumbered bank accounts holding approximately $4.89 million.  This cash is the net

---

[2] It is worth noting that while the Prepetition Lenders tend to view the business solely through the prism of the vessels over which they hold liens, the shipping community draws no similar distinction. To the market, MPS owns and charters six ships. The market cares not whether the vessel is pledged to Credit Agricole or RBS. Thus, a profitable voyage for the Laura inures to the benefit of the Debtors as a whole, because it reinforces that all of the Debtors' vessels are ready and able to undertake voyages in the ordinary course. Likewise, declining a charter due to budget constraints would create a negative market sentiment about the Debtors' vessel operations as a whole. While both Prepetition Lenders are entitled to their own parochial views on their vessels, this is truly a business model in which the proverbial "rising tide" raises (or lowers) all boats.

[3] Ultimately, Credit Agricole expressed that it would be willing to fund the Laura Voyage, but by that time, the opportunity had already passed.

proceeds generated by the sale of unfinished shipping assets and will be used to provide the DIP Facility.

Unless the Debtors are granted the relief requested in this Motion (and the Cash Collateral Motion on a final basis), the Debtors' ability to properly reorganize their businesses will be materially impaired. By allowing the Debtors to fund new voyages, operate their businesses and administer these Cases, the Debtors believe that the DIP Facility (as defined herein) will enable them to maximize the value of their assets for the benefit of all stakeholders.

## JURISDICTION

1.      This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Bankruptcy Rules 2002, 4001, and 9014.

## RELIEF REQUESTED

2.      By this Motion, the Debtors request entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "***Interim DIP Order***"), which will provide the Debtors with critical and necessary access to a senior secured superpriority debtor in possession stand-by term loan facility in an aggregate principal amount of up to $2,400,000 (the "***Interim DIP Facility***"). The Debtors are also requesting the entry of a final order approving the relief granted in the Interim DIP Order on a final basis (the "***Final DIP Order***", and together with the Interim DIP Order, the "***DIP Orders***") and approving the Debtors' access up to an additional $2,400,000 of financing (together with the Interim DIP Facility, the "***DIP Facility***").

<u>**CONCISE STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 4001-2**</u>

        3.      Pursuant to Bankruptcy Rules 4001(b), (c) and (d), and Local Bankruptcy Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Documents and DIP Orders: [4]

| Material Term | Summary of Material Term |
|---|---|
| **Prepetition Facilities** | <u>Credit Agricole</u>**:** the "***Credit Agricole Credit Agreement***" as secured by the "***Credit Agricole Collateral***" (each as defined below)<br><br><u>RBS</u>: the "***RBS Credit Agreement***" and the "***RBS Collateral***" (each as defined below)<br><br>Together, the "***Prepetition Facilities***" and the "***Prepetition Lenders***" (in each case to the extent valid, enforceable and not avoidable or subject to setoff or counterclaim) |
| **DIP Credit Agreement Parties**<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | <u>Borrower</u>**:** Seaarland Shipping Management B.V. (the "***Borrower***")<br><br><u>Guarantors</u>: Marco Polo Seatrade B.V., Magellano Marine C.V. and Cargoship Maritime B.V. (the "***Guarantors***" and, together with the Borrower, the "***Obligors***")<br><br><u>DIP Lender</u>: Futmarine B.V. or its designee (the "***DIP Lender***"). |
| **Maturity**<br><br>*Fed R. Bankr. P. 4001(c)(1)(B)* | The DIP Facility terminates on the earliest to occur of (the "***Stated Maturity Date***"):<br><br>(i) August 1, 2012,<br><br>(ii) the effective date of any plan of reorganization with respect to any Obligor,<br><br>(iii) the date of conversion of any Case to a case under Chapter 7 of the Bankruptcy Code,<br><br>(iv) the date of any termination of the exclusivity period for any Obligor; and<br><br>(v) the date of any appointment of a Chapter 11 trustee or other disinterested person with expanded powers pursuant to Bankruptcy Code § 1104(c) in any Case. |
| **Standby Nature; Use of Proceeds**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Pursuant to the Debtors' Motion for (I) Interim and Final Orders (A) Authorizing the Use of Cash Collateral and (B) Granting Adequate Protection (II) a Final Protective Order with Respect to Certain Unencumbered Accounts; and (III) Scheduling a Final Hearing (the "***Cash Collateral Motion***") the Debtors are seeking permission from the Bankruptcy Court to use the Cash Collateral of the Prepetition Lenders ("***Cash Collateral***") and intend to do so in accordance with the approved budget (from time to time, the "***Budget***"). The Debtors plan to use Cash Collateral under and to the extent permitted in the Bankruptcy Court's Cash Collateral orders from time to time (collectively, the "***Cash Collateral Order***").<br><br>During the term of the Cash Collateral Order, the Borrower shall be entitled to draw on the DIP Facility to the extent (and only to the extent) (A) for expenditures other than |

---

[4] This summary is qualified in its entirety by reference to the DIP Agreement and any order of this Court relating to the proposed postpetition financing described herein.

| | |
|---|---|
| | those necessary to fund a "spot" voyage for the Laura (i) after, first, applying Cash Collateral and, second, cash from the Unrestricted Accounts subject to the Minimum Unrestricted Cash Balance (as defined below), the Debtors do not have sufficient capital to make payments under the Budget or (ii) the Debtors exceed the permitted variance of 15% from the Budget that shall be set forth in the final Cash Collateral Order, but only after the payment of such expenses, on a pro forma basis, would cause the amounts in the Unrestricted Accounts to be less than the Minimum Unrestricted Cash Balance, and (B) for expenditures necessary to fund a "spot" voyage for the Laura if, after applying Cash Collateral, the Debtors do not have sufficient capital to make payments under the Budget or as otherwise necessary to fund any voyage; provided, however, that the DIP Facility will be automatically drawn down upon entry of the Interim DIP Order to reimburse the Debtors for expenditures made from the Unrestricted Accounts in connection with prefunding any Laura voyage (the "***Laura Voyage Draw***") that would be subject to paragraph 15 of the Interim Cash Collateral Order (the "True-Up" provision).  All such draws shall be used solely for Budget items, except as provided in (B) of the previous sentence, and as may otherwise be ordered by the Court or as otherwise consented to by the DIP Lender.

The "***Minimum Unrestricted Cash Balance***" shall be $300,000 of cash in the Unrestricted Accounts.

After any termination of the Cash Collateral Order, the Borrower shall be entitled to draw on the DIP Facility (i) to pay necessary expenses to operate, insure and maintain the vessels and (ii) to pay other administrative expenses, including allowed professional fees and expenses of the Debtors.

To the extent the Prepetition Lenders have final allowed adequate protection claims under the Cash Collateral Order for a diminution in value (as more particularly described in the Cash Collateral Order), the Borrower shall be required to draw on the DIP Facility to pay such claims. |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Borrower to pay 5% interest per annum, which shall accrue and be payable on the Stated Maturity Date. |
| **DIP Commitment**<br><br>*Local Bankruptcy Rule 4001-2(a)(1)<br>Fed. R. Bankr. P. 4001(c)(1)(B)* | The total commitment under the DIP Facility shall be $4.8 million. |
| **Conditions**<br><br>*Local Bankruptcy Rule 4001-2(a)(2); Local Bankruptcy Rule 4001-2(h); Fed. R. Bankr. P. 4001(c)(1)(B)* | (i)  No trustee, or other disinterested person with expanded powers pursuant to Bankruptcy Code § 1104(c), shall have been appointed or designated with respect to any Debtor or their respective business, properties or assets and no motion shall be pending seeking any such relief.<br><br>(ii)  Entry of the Final Cash Collateral Orders in the forms attached hereto as **Exhibit B**.<br><br>(iii)  Entry of the Interim DIP Order with respect to the Interim DIP Facility and the Final DIP Order with respect to the Final DIP Facility. |
| **Fees**<br><br>*Local Bankruptcy Rule 4001-2(a)(3); Fed. R. Bankr. P.* | None. |

| | |
|---|---|
| *4001(c)(1)(B)* | |
| **Liens and Priorities**<br><br>*Local Bankruptcy Rule 4001-2(a)(4)*<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Liens.** The obligations of the Borrowers under the DIP Facility shall be secured by the following liens (the "***DIP Liens***"):<br><br>   a.  **First Priority Liens.** Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Facility will be secured by a perfected first priority security interest and lien on all now owned or hereafter acquired assets and property of the Obligors including, without limitation or duplication, (i) cash and cash equivalents (including the Cash Collateral), (i) the Prepetition Collateral and each of the Obligor's ships, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, trade names and other intellectual property and capital stock of subsidiaries or affiliates, (iii) causes of action (other than claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code (collectively, "***Avoidance Actions***")), and (iv) the proceeds thereof (the "***DIP Collateral***"), to the extent that such DIP Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date.<br><br>   b.  **Junior Priority Liens.** Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Facility will be secured by a perfected junior security interest and lien on the DIP Collateral to the extent that such DIP Collateral is subject to valid, perfected and unavoidable liens that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.<br><br>   c.  **Priming Liens.** Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Facility will be secured by a perfected first priority priming security interest and lien on the DIP Collateral ahead of (i) the liens securing the Credit Agricole Collateral, (ii) the liens securing the RBS Collateral, (iii) any actual or asserted rights of setoff by the Prepetition Lenders, and (iv) liens or interests of any other party other than those holding valid, perfected and not avoidable maritime liens under applicable law for "necessaries" (but excluding any such liens asserted by any of the parties referred to in the foregoing clauses (i) through (iv)).<br><br>      The priming liens are senior in all respects to the interests in such property of any Prepetition Lender or any other creditor except as noted in clause (v). The primed liens shall be primed by and made subject and subordinate to the perfected first priority senior priming liens to be granted to the DIP Lender, which senior priming liens in favor of the DIP Lender shall also prime any liens granted to provide adequate protection in respect of any of the primed liens.<br><br>**DIP Facility Administrative Priorities.** Pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, the DIP Facility will be entitled to superpriority administrative expense claim status in the Chapter 11 Cases for each Obligor.<br><br>**Adequate Protection.** Substantially, the same as provided in the Cash Collateral Order, but subject to the DIP Liens and the DIP Facility Administrative Priorities. |
| **Carve-Out**<br><br>*Local Bankruptcy Rule 4001-2(a)(5)*<br><br>*Local Bankruptcy* | The term "***Carve-Out***" means the following items of expenses and fees that are accrued during the period covered by the applicable DIP Order and the Budget: (a) the unpaid fees of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (b) the aggregate accrued and unpaid fees and expenses payable under Bankruptcy Code sections 330 and 331 to professionals retained pursuant to an order of the Court by the Debtors and the Official Committee of Unsecured Creditors appointed in the Chapter 11 |

| | |
|---|---|
| *Rule 4001-2(d)* | Cases (the "***Committee***") not to exceed the amounts permitted therefor in the Budget except as otherwise ordered by the Court, and incurred on or prior to the business day immediately following an Event of Default and delivery of a notice of such default by the DIP Lender (the "***Carve-Out Notice***"); (c) the fees and expenses of a trustee appointed upon conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code not to exceed $2,500; (d) all fees incurred subsequent to such business day by professionals retained by the Debtors appointed in the Chapter 11 Cases not to exceed $250,000 in the aggregate; and (e) all fees incurred subsequent to such business day by professionals retained by the Committee not to exceed $25,000 in the aggregate.<br><br>The Borrower shall fund a segregated account (the "***Carve-Out Account***") not subject to control, foreclosure or sweeping by the DIP Lender immediately upon delivery of a Carve-Out Notice. |
| **Covenants**<br><br>*Local Bankruptcy Rule 4001-2(a)(8); Fed. R. Bankr. P. 4001(c)(1)(B)* | **Negative Covenants**<br><br>The Obligors will covenant not to make draws on the DIP Facility for any other purpose than as described under "Standby Nature; Use of Proceeds" above.<br><br>The Obligors will covenant that they will not incur or pay any non-operating expenses or any other expenses outside of the ordinary course of their business without reasonable prior notice to the DIP Lender.<br><br>**Financial Covenants**<br><br>None. |
| **Limitations on Use of DIP Facility**<br><br>*Fed. R. Bankr. P. 4001-2(a)(9)* | No proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, any of the Debtors or DIP Lender's (or any of their officers', directors', employees', members', shareholders', or affiliates') liens or claims, or the initiation or prosecution of any claim or action against the Debtors or the DIP Lender (or any of their officers, directors, employees, members, shareholders, or affiliates), including any claim under chapter 5 of the Bankruptcy Code. |
| **Events of Default; Remedies**<br><br>*Local Bankruptcy Rule 4001-2(a)(10) Fed. R. Bankr. P. 4001(c)(1)(B)* | **Events of Default**<br><br>None other than the events triggering the Stated Maturity Date as described above.<br><br>**Remedies**<br><br>At the option of the DIP Lender, repayment in full or conversion into equity pursuant to a plan of reorganization, or any combination of the foregoing. |
| **Change of Control**<br><br>*Local Bankruptcy Rule 4001-2(a)(11)* | "Change of control" is not included as an event of default under the DIP Facility. |
| **Milestones**<br><br>*Local Bankruptcy Rule 4001-2(a)(12) Fed. R. Bankr. P. 4001(c)(1)(B)(v-vi)* | None. |
| **Repayment** | Repayments shall not be permitted without Bankruptcy Court approval. |

| | |
|---|---|
| *Local Bankruptcy Rule 4001-2(a)(13)* | |
| **Joint Liability**<br><br>*Local Bankruptcy Rule 4001-2(a)(14), 4001-2(e)* | The obligations of each of the Obligors under the DIP Facility are joint and several. |

## BACKGROUND

4.      The Debtors operate an international commercial vessel management company that specializes in providing commercial and technical vessel management services to third parties. Founded in 2005, the Debtors mainly operate under the name of Seaarland Shipping Management and maintain their corporate headquarters in Amsterdam, the Netherlands. The Debtors' primary assets consist of six tankers that are regularly employed in international trade, and call upon ports worldwide.

5.      On July 29, 2011 (the "***Petition Date***"), the Debtors filed voluntary petitions for relief in the Court under Chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors in possession. No trustees or examiners have been appointed in these cases. The Cases are being jointly administered pursuant to the Court's Order Directing Joint Administration of Related Chapter 11 Cases, dated August 3, 2011.

6.      Additional factual background regarding the Debtors, including their current and historical business operations and the events precipitating these Chapter 11 filings, is set forth in detail in the Declaration of Barry Michel Cerneus (I) in Support of Debtors' Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2, and is incorporated herein by reference.

**Description of the Debtors' Prepetition Senior Indebtedness**

7.     As of the Petition Date, the Debtors had prepetition secured indebtedness of approximately $211,743,838, consisting of the following:

    a.     <u>Credit Agricole Facility</u>: $89,743,838[5] outstanding under that certain loan agreement, dated as of September 22, 2005 (as amended, supplemented or otherwise modified as of the Petition Date, the "***Credit Agricole Credit Agreement***"), among MPS, the several lenders party thereto from time to time (the "***Credit Agricole Lenders***"), and Credit Agricole, as agent; and

    b.     <u>Royal Bank of Scotland Facility</u>: $117,664,953[6] outstanding under that certain loan agreement, dated as of August 14, 2007 (as amended, supplemented or otherwise modified as of the Petition Date, the "***RBS Credit Agreement***" and together with the Credit Agricole Credit Agreement, the "***Senior Credit Agreements***"), among MPS, the several lenders party thereto from time to time (the "***RBS Lenders***"), and RBS as agent (and together with Credit Agricole, the "***Agents***").

8.     The obligations under the Credit Agricole Credit Agreement hold mortgages on three of the Debtors' six ships (the "***Credit Agricole Ships***"): (i) the Montiron, a 115,000 dwt Aframax tanker built in 2003 by Sanoyas, Japan, registered under IMO number 9256860 (the "***Montiron***"); (ii) the Diana, a 38,500 dwt MR Product tanker built in 2005 by Guangzhou S.Y. Int., China, registered under IMO number 9299496 (the "***Diana***"); and (iii) the Laura, a 113,000 dwt Aframax tanker built in January 2009 by New Times S.B., China, registered under IMO number 9417787 (the "***Laura***," and collectively with the Montiron and the Diana, the "***Credit Agricole Ships***").

---

[5] These amounts do not adjust for the Cash Sweep. Of the $1,770,143.89 swept by the Credit Agricole Agent, the Debtors understand that only $1,210,475.09 was applied to the outstanding balance under the Credit Agricole Credit Agreement, with the remaining $559,668.80 used to pay the Credit Agricole Agent's fees and expenses. Additionally, the foregoing amount includes $2,024,671 outstanding in respect of an interest rate swap as of June 30, 2011.

[6] This amount includes $17,100,453 outstanding in respect of an interest rate swap as of June 30, 2011.

9.      Additionally, under the terms of the Credit Agricole Credit Agreement, the Credit Agricole Lenders are secured in the cash intake accounts maintained for each of the Montiron (account number 00223202141), the Diana (account number 00223202335), and the Laura (account number 00227305920) (the "*Credit Agricole Pledged Accounts*" and together with the Credit Agricole Ships, the "*Credit Agricole Collateral*").  Credit Agricole swept these accounts prior to the commencement of these Cases.

10.     The DIP Lender maintains two unencumbered accounts with Credit Agricole holding approximately $4.874 million and $20,012.82. This cash is the net proceeds generated by the sale of unfinished shipping assets (the "*DIP Lender Accounts*").  The DIP Lender intends on using these proceeds to provide the DIP Facility.  These proceeds themselves are not subject to any liens or security interests of any of the Credit Agricole Lenders or any other party.  As further detailed below, Top Ships USA, Inc. (or one or more of its affiliates), a prepetition creditor, has purportedly attached MPS's equity interests in the DIP Lender.  This purported attachment is limited to those equity interests and does not extend to or otherwise restrict the use of the cash in the DIP Lender Accounts as contemplated herein.

11.     The obligations under the RBS Credit Agreement are secured by mortgages on the Debtors' remaining three ships, which are: (i) M/T Beth, a 38,396 dwt oil/chemical tanker built in 2007 by Guangzhou Shipyard Int. Company, China, registered under IMO number 9374416 (the "*Beth*"); (ii) M/T Louise, a 73,747 dwt oil tanker built in 2008 by New Century Shipbuilding Co., China, registered under IMO number 9417763 (the "*Louise*"); and (iii) M/T Meg, a 38,396 dwt oil/chemical tanker built in 2007 by Guangzhou Shipyard Int. Company, China, registered under IMO number 9340116 (the "*Meg*," and together with the Beth and the Louise, the "*RBS Ships*").

12.     Further, under the terms of the RBS Credit Agreement, the RBS Lenders are secured in the cash intake accounts maintained for each of the Beth (account number 00362585), the Louise (account number 00384570), and the Meg (account number 00362615) (collectively, the "**RBS Pledged Accounts**" and together with the RBS Ships, the "**RBS Collateral**" and the RBS Collateral together with the Credit Agricole Collateral, the "**Prepetition Collateral**").   As of the Petition Date, the RBS Pledged Accounts held $1,730,146.13.   In addition to the RBS Pledged Accounts, the Debtors maintain five accounts with RBS (account numbers 00436422, 00362607, 50029274, 00412833, and 00362534; (collectively, the "**Unrestricted Accounts**"), holding approximately $1,099,193.17 of unencumbered cash.

**The Laura Voyage**

13.     On August 18, 2011, the Debtors were offered an opportunity to trade the Laura, one of the three vessels secured under the Credit Agricole loan, on a voyage that was estimated to yield up to $700,000 in net profits.   The Debtors believed that the upfront expenses for this voyage would be approximately $2 million.   The expenses would have covered, among other things, fuel costs, insurance premiums, straight and port costs (the "**Laura Voyage Expenses**").   Approximately half of the Laura Voyage Expenses would need to have been paid within 6 days of embarking on the voyage (the "**Initial Laura Voyage Expenses**").

14.     As is typical in the Debtors' industry, the Debtors were required to confirm their acceptance of the Laura Voyage on quick turnaround basis.   Thus, immediately upon receiving the offer for the Laura Voyage, the Debtors concluded that they had two alternatives to fund the Laura Voyage Expenses.   The first most likely alternative was obtaining funding from Credit Agricole and the Credit Agricole Lenders.   As of August 19, 2011, the balance of the Credit Agricole Cash Collateral was zero.   Although the Debtors expected to

receive receivables associated with the Credit Agricole Ships in the near term, including a payment from A.P. Moller-Maersk A/S,[7] even these amounts would have been insufficient to support the Laura Voyage Expenses. For that reason, on August 19, 2011, the Debtors requested that Credit Agricole and the Credit Agricole Lenders advance the funds necessary for the Debtors to undertake the Laura Voyage. Upon receiving the request from the Debtors, Credit Agricole and the Credit Agricole Lenders began to review the voyage particulars to determine whether they would be willing to fund the voyage.

15. Even while Credit Agricole was reviewing the funding request, by the morning of August 22, 2011, the Debtors realized that any further delay in confirming their availability for the Laura Voyage would further harm the Debtors' chances of trading the Laura on this voyage. Given the importance of the Laura Voyage to the Debtors' cash flows and reputation in the shipping industry, the Debtors confirmed their availability for the Laura Voyage and began formulating a back-up strategy that contemplated use of cash in the Unrestricted Accounts, if necessary, and the debtor in possession financing relief requested by this Motion.[8] Regrettably, prior to gaining access to the necessary capital, the Debtors were informed that the charterer ultimately chose not to hire the Laura for the Laura Voyage. Due in part to the Debtors' delayed response and the charterer's shaken confidence in the Debtors' ability to prefund the voyage, on August 25, 2011, the charterer advised the Debtors that it would not be hiring the Laura.

---

[7] *See* Stipulation between Debtors and A.P. Moller-Maersk A/S. [Docket No. 71].
[8] Prior to being informed that the charterer decided not to hire the Laura for the voyage, the Debtors were preparing to seek emergency debtor in possession financing relief in order to timely fund the Laura Voyage Expenses. Should the opportunity to trade the Laura for a new capital intense voyage, like the Laura Voyage, present itself prior to the Interim DIP Hearing, the Debtors will seek to expedite these proceedings and ask the Court to hear this Motion on an emergency basis.

16.     The Debtors, in their business judgment, have determined that the risks associated with losing another profitable voyage are too great.  In addition to the direct economic benefits of trading the Laura on a spot basis, the Debtors believe that Laura voyages will have an indirect economic benefit for all of their vessels, including the RBS Ships.  The Debtors believe that future Laura voyages will send a strong message to the shipping market regarding the Debtors' ability to operate their vessels and take on capital intense voyages.  If, however, the Debtors are unable to timely accept future high paying voyages because they lack adequate and flexible sources of funding, the Debtors fear this would send a negative message to the markets, which could set back the Debtors restructuring efforts.  In the shipping industry in particular, timing is just as critical of a component to the success of a business.  If the Debtors are unable to operate their businesses in the ordinary course and accept profitable voyages without the need to constantly seek concessions from the Prepetition Lenders, the Debtors risk losing the progress they have made since the Petition Date.

17.     For those reasons, the Debtors are seeking the relief requested in this Motion.  In doing so, the Debtors will be provided with the operational flexibility to undertake profitable voyages in the future.

**Debtors' Marketing Efforts for Postpetition Financing**

18.     As set forth in the Cerneus Declaration, the circumstances precipitating the Debtors' Chapter 11 Cases left them without the opportunity to approach the capital markets for financing prior to the Petition Date.  At the outset of these cases, the Debtors believed that they would still be able to operate their ships and preserve the going concern value of their businesses with just the use of Cash Collateral and access to what they believed was

unencumbered cash in the Unrestricted Accounts. Thus, with the limited time the Debtors had to prepare for these Chapter 11 Cases, the Debtors focused their resources on establishing the basis for the use of Cash Collateral and unencumbered cash.

19.     Access to the Unrestricted Accounts was quickly cut off during the first week of the Debtors' Chapter 11 Cases after RBS asserted its "belief" that the Unrestricted Accounts were subject to a right of setoff. After negotiations with the Debtors' Prepetition Lenders over the use of Cash Collateral came to a standstill, on August 8th, the Debtors sought to approve debtor in possession financing for $1 million on an emergency basis (the "***Emergency DIP Motion***"). Shortly after filing the Emergency DIP Motion, RBS informed the Debtors that they had concluded that the Unrestricted Accounts, were in fact, unrestricted. Upon gaining access to the Unrestricted Accounts, the Debtors withdrew the Emergency DIP Motion and proceeded to work toward a resolution with the Prepetition Lenders with respect to the use of Cash Collateral.

20.     At the Interim Cash Collateral Hearing, the Debtors informed the Court that they would use the three week Interim Period to, among other things, evaluate their future prospects and provide the Court with a clearer view of their business, its needs, and its prospects. On August 12, the Court entered an order authorizing the use of Cash Collateral on an interim basis (the "***Interim Cash Collateral Order***").

21.     Following entry of the Interim Cash Collateral Order, the Debtors began to explore the need for postpetition financing as part of their consideration of an overall business plan. Through their counsel, the Debtors approached various financial institutions, including private equity and hedge funds, in hopes of obtaining postpetition financing on reasonable terms.

The Debtors, through their counsel, also contacted a financial institution that regularly serves as administrative agent for postpetition financings within the commitment range of the DIP Facility. Of the eight institutions contacted by the Debtors in this limited timeframe, only two funds expressed an interest in providing the financing, both with steep rates of interest (ranging from 13 to 15%) and fees (ranging from 2 to 6%). For the other six financial institutions, the parties declined due to, among other reasons, the size of the facility was below minimum lending thresholds, the restrictions on lending against assets not located in the U.S., an unwillingness to participate in a priming fight, and an unwillingness to lend on a stand-by basis because the requirement to commit funds would not yield a sufficient rate of return.

22.     Concurrently, the Debtors began exploring postpetition financing with the DIP Lender, a non-debtor joint venture 50% owned by MPS. The Debtors' efforts culminated with the proposed DIP Facility for up to $4.8 million on a stand-by basis (except with respect to the Laura Voyage Draw) bearing a 5% rate of interest and no fees.

23.     On August 16, 2011, the Debtors advised RBS that they were exploring postpetition financing opportunities from third parties and the DIP Lender (on substantially the same terms, other than the commitment amount, as the postpetition financing sought on August 8, 2011) and offered RBS the opportunity to submit an indication of interest. On August 19, 2011, the Debtors followed-up with RBS regarding their interest in providing the postpetition financing, but were informed that no decision had been made on the issue. The Debtors again followed up with RBS on August 21, 2011 regarding their interest and were informed that a meeting had been scheduled to discuss the issue on August 24, 2011. Ultimately, RBS informed the Debtors that it will not be submitting an indication of interest.

24.     On August 19, 2011, as part of the Debtors' discussions with Credit Agricole regarding the Laura Voyage, the Debtors advised Credit Agricole that one of the funding alternatives for the voyage contemplated the use of postpetition financing from the DIP Lender on substantially the same terms (other than the commitment amount) as the postpetition financing sought on August 8, 2011.  At that time, the Debtors offered Credit Agricole the opportunity to submit an indication of interest.  On August 25, 2011, Credit Agricole informed the Debtors that it would not be submitting a financing proposal.

25.     As it currently stands, the most obvious lenders in this scenario have declined to make a financing proposal to the Debtors.  Because the Debtors believe that the DIP Lender is the only party capable of providing the necessary financing on the most favorable economical terms and least restrictive basis, the Debtors agreed to the terms of the DIP Facility.

**The DIP Lender**

26.     The DIP Lender is a joint venture created by MPS and Bentonwood B.V. ("***Bentonwood***") in 2010 for the purpose of contracting for the construction of three vessels.  By the hearing to consider the DIP Motion, MPS and Bentonwood will have entered into a shareholders' agreement, pursuant to which Bentonwood will agree to vote its interest in the DIP Lender in accordance with MPS' instructions.[9]

27.     In early 2011, the DIP Lender reached an agreement to sell the three shipbuilding contracts with Hyundai to a third party.  The sale generated $9.8 million in net proceeds to be distributed equally to the DIP Lender's shareholders.  Bentonwood has already

---

[9] The Debtors sought this arrangement in response to certain concerns that were raised at the August 8, 2011 hearing on the Emergency DIP Motion regarding the insider nature of the proposed financing.  The Debtors believe that their control over Bentonwood's voting rights nullifies any similar concerns with respect to the DIP Lender.

received its share of the proceeds from the DIP Lender. MPS has not received its share of the proceeds because Top Ships, Inc. ("**Top Ships**"), through its owner nominees Indiana R. Shipping Co. Ltd. ("**Indiana**") and Banksy Shipping Company Limited ("**Banksy**"), was granted a prejudgment attachment by a court in Amsterdam on MPS's shares in the DIP Lender blocking distribution of the proceeds to MPS. The attachment relates to a disputed claim by Top Ships against MPS, not the DIP Lender.

28. The attachment relates solely to the shares of the DIP Lender and any economic benefits that would be distributed through a share dividend or other shareholder distribution to MPS. The Top Ships attachment does not extend to any of the assets of the DIP Lender, which has no obligations to Top Ships. Accordingly, the Top Ships attachment would not prohibit the DIP Lender from extending the DIP Facility to the Debtors on a secured basis for the simple reason that the attachment does not attach to the DIP Lender's assets.

29. Top Ships can make no credible argument that a DIP Facility diminishes the DIP Lender's assets for the simple reason that the cash is being replaced with a secured receivable, which is an asset that benefits from the substantial security, priority and legal rights that governs the DIP Facility.[10] Finally, the Top Ships' claim is a disputed claim. Until the claim is adjudicated at a much later date, Top Ships has no ability to enforce a purported and speculative security interest that may be subject to avoidance under Chapter 5 of the Bankruptcy Code. Moreover, the Top Ships claim may ultimately prove to be without merit or, if

---

[10] For the avoidance of doubt, any description of the Top Ships dispute contained herein shall not constitute an admission of liability, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that the Top Ships debt or claim listed herein is a disputed claim or debt, and to challenge the validity, priority, enforceability, nature, amount and/or status of any such claim or debt.

meritorious, might be for an amount substantially less than the $4.8 million, or subject to treatment as a general unsecured claim.

**Proposed Postpetition Financing**

30.     The Debtors, in consultation with their legal advisors, have entered into a binding Debtor in Possession Credit Agreement (the "***DIP Agreement***") with the DIP Lender.  A true and correct copy of the DIP Agreement, which sets forth the terms of DIP Facility, is attached hereto as **Exhibit C**.  The effectiveness of the DIP Agreement is conditioned upon (i) the entry of the Final Cash Collateral Orders, the Interim DIP Order (with respect to the Interim DIP Facility) and the Final DIP Order (with respect to the Final DIP Facility), and (ii) no motion seeking to appoint a trustee pursuant to Bankruptcy Code § 1104(c) having been granted or pending.

31.     The Debtors believe that these terms will (i) enhance the Debtors' ability to quickly act on future spot voyages for the Laura, (ii) provide the Debtors with the necessary flexibility to operate their businesses in a manner that will maximize the value of their estates, including the Prepetition Collateral, (iii) reasonably address their need for financing, and (iv) constitute the best financing option available to them given the circumstances of their business, their capital structure, and these Cases.  Indeed, in light of the size of the DIP Facility - $4.8 million - the Debtors do not believe they would have been able to find an alternative source willing to provide such financing on the current pricing as the DIP Facility, let alone on a stand-by basis, i.e. no fees, 5% interest, which is deferred until maturity, covenants limited to the incurrence of expenses, no milestones, and no liens on Avoidance Actions.  Moreover, as most third party financing sources would have likely required meaningful due diligence (plus a related work fee), the Debtors do not believe they would have been able to obtain financing from any

other party within the compressed timeframe that is needed to support operations and to aggressively pursue upcoming voyages.

32.     As described above, the DIP Facility is a stand-by facility for up to $4.8 million and is conditioned on the Debtors' receipt of access to the Cash Collateral on the terms set forth in the Final Cash Collateral Orders.  Other than the Laura Voyage Draw, if any, and costs for future Laura voyages, the Debtors would only have the right to draw down amounts necessary to cover costs if no Cash Collateral is available and using Unencumbered Cash would cause the balance of the Unrestricted Accounts to fall below $300,000 or if use of the Cash Collateral would cause the Debtors to exceed a 15% line-item variance in the Budget.

33.     To the extent of any draws, the DIP Lender will receive DIP Liens on the DIP Collateral pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code. Amounts drawn on the DIP Facility will constitute allowed super-priority administrative claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code.

## RELIEF REQUESTED

34.     By this Motion, pursuant to sections 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2, the Debtors request:

    a.    authorization for the Debtors to borrow up to $2,400,000 in principal amount, on an interim basis, and up to $4,800,000 in principal amount, on a final basis, of postpetition financing on the terms and conditions set forth in the DIP Agreement, as summarized in this Motion;

    b.    authorization for the Debtors to execute and deliver any necessary documents, to perform such other and further acts as may be necessary or appropriate in connection therewith, and to grant the liens and security interests to the DIP Lender as provided for in the DIP Agreement;

c. authorization pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code to grant certain priming liens and superpriority claims to the DIP Lender pursuant to sections 364(c)(1) of the Bankruptcy Code to secure the Debtors' obligations under the DIP Agreement; and

d. authorization for the DIP Lender to require repayment of the DIP Facility in full or conversion into equity pursuant to a plan of reorganization, or any combination of the foregoing, upon an event triggering the Stated Maturity Date in accordance with the DIP Agreement, subject to the provisions of this Motion and any order granting this Motion.

## **BASIS FOR RELIEF**

**Request for Approval of the DIP Facility and Related Actions**

35. Over the four weeks following the Petition Date, the Debtors have found themselves shut off from capital in varying degrees by their Prepetition Lenders on three separate occasions – first, by both Credit Agricole and RBS in connection with the emergency hearing on the Debtors' use of Cash Collateral on August 2, 2011, second, by Credit Agricole in connection with the Debtors' first emergency motion for postpetition financing on August 8, 2011, and third, on August 10, 2011, by RBS in connection with the Debtors' preliminary hearing on interim use of Cash Collateral. Following the entry of the Interim Cash Collateral Order, the Debtors were hopeful for a smoother path forward.

36. The Debtors have expended a significant amount of time and resources to stabilize their businesses after a tumultuous entry into Chapter 11. Now that the Debtors have turned their effort and attention to restructuring their businesses as a whole, rather than simply seeking stabilization, the events surrounding the Laura Voyage have demonstrated a heightened need for postpetition financing. The Debtors' lack of alternative funding for their businesses has led the Debtors to the conclude that the only way they will have the level of flexibility and

independence that is required to operate their businesses in a way that will maximize value for all creditors, is to access the inexpensive and unrestrictive financing offered by this DIP Facility.

37. Currently the Debtors do not have that flexibility. For example, on August 19, 2011, the Debtors contacted RBS's counsel regarding the Laura Voyage and certain Laura Voyage Expenses that may have been payable in the month of August (the "***Potential August Expenses***"). The Debtors advised RBS' counsel that because of the unanticipated magnitude of Potential August Expenses, there may be an unintended windfall conferred upon RBS. Specifically, to the extent that expenses would be paid between August 10 and August 31 in respect of Credit Agricole's Collateral from the Unrestricted Accounts, i.e. the "True-Up Amount," the Debtors would have been required to transfer from their Unrestricted Accounts an amount equal to the True-Up Amount into the RBS Pledged Accounts (the "***True-Up***"). The Debtors explained that if applied to the Potential August Expenses, the Debtors would not be able to offset these expenses against the revenue they would have generated from the Laura Voyage in October 2011. RBS rejected the Debtors' request for a waiver.

38. Moreover, the DIP Facility provides the Debtors with the necessary financing to fund voyages like the Laura Voyage in the future. This is critical to the Debtors' ability to reorganize for two primary reasons. First, as discussed above, there is currently insufficient Credit Agricole Cash Collateral to finance long term spot voyages. While the Debtors are projected to receive payments in respect of these vessels in the near term, they would still leave the Debtors with little breathing room. This places the Debtors in a difficult circular position. To generate cash to supply their ships, the Debtors must obtain contracts for their vessels to transport cargo. The Debtors cannot make any trade voyages to generate working capital, however, until the ships are first re-provisioned and refueled. In pure economic terms,

the Debtors' vessels are significantly more valuable when operating under a contract to ship cargo than when the ships remain idle in international waters. Unless this circle is broken with the infusion of cash, the Debtors' ability to sustain their operations will be challenged. The DIP Facility accomplishes this breakage. As a result of the DIP Facility, the Debtors will be able to take on voyages and generate profits that will result in an increase in the Debtors' Cash Collateral cushion for the Credit Agricole Ships. The DIP Facility and the cash in the Unrestricted Accounts will finally provide the Debtors with sufficient sources of capital to carry out voyages in the future.

39.     Second, aside from the immediate economic benefits, the Debtors' continued participation in the cargo shipping market, and particularly their ability to fund a significant spot voyage, will send a signal to the market that the Debtors are functioning in the ordinary course. The Debtors believe that the additional liquidity provided by the DIP Facility will assist in fortifying their reputation and goodwill. Conversely, it will become more and more difficult for the Debtors to regain customer confidence if the Debtors remain inactive.

40.     Additionally, the DIP Facility will provide the Debtors with the necessary resources needed to administer these cases, implement their restructuring initiatives and bring these Cases to a successful conclusion.

41.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c), a court may authorize the obtaining of credit or the incurring of debt, repayment

of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

42.     Because the Debtors' proposed DIP Facility is secured by liens on all of the Debtors' property that prime certain liens that may exist on the DIP Collateral, the approval of the DIP Facility is governed by sections 364(c) and 364(d) of the Bankruptcy Code.

**Financing Under Bankruptcy Code § 364(c)**

43.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interests of its estate.  *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Simasko Production Co*., 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for the benefit of the estate); *see also* 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev.).

44.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under section § 503(b)(l) of [the Bankruptcy Code] as an administrative expense."  *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.

Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) must prove that it was unable to obtain unsecured credit pursuant to section 364(b)).

45.　　Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c):

　　　　a.　　the debtor is unable to obtain unsecured credit solely under section 364(b) (i.e. by granting a lender administrative expense priority);

　　　　b.　　the credit transaction is necessary to preserve the assets of the estate; and

　　　　c.　　the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

46.　　To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c). *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable. "*Id*. at 1088; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001)

(superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing. "*In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

47.     Due to the extremely tight time constraints under which the Debtors are operating, their own assets and liabilities, the general state of the marine transportation industry and a check of the capital markets, the Debtors strongly believed that they would be unable to obtain unsecured financing from any capital source.  Further, the Debtors believe that the related nature of the DIP Lender to the Debtors is to the benefit, and not to the detriment, of the estates. The identity of the DIP Lender and its relationship to the Debtors was fully disclosed in the Cerneus Declaration and does not rise to the same level of scrutiny typically reserved for insider postpetition financings where a shareholder or other "control" party is the lender.  Indeed, the Debtors' ability to direct the voting of Bentonwood's interest in the DIP Lender will further insulate this financing from insider concerns.

48.     The Debtors believe that the good faith nature of the DIP Facility is implicit in the materially below market terms of the DIP Facility and lack of any restrictions such as those that are customary for third party postpetition loans.  The results of the Debtors' efforts to seek third party financing support this position.  Accordingly, the Debtors believe that the terms and conditions of the DIP Facility are reasonable and justified under the circumstances. The facility will enable the Debtors to operate their business and regain the confidence of the

international shipping community. These two goals will position the Debtors to successfully emerge from Chapter 11.

**Financing Under Bankruptcy Code § 364(d)(l)**

49. The Debtors are seeking approval of the DIP Facility under section 364(d)(l) of the Bankruptcy Code. Specifically, the DIP Lender would receive perfected liens upon the DIP Collateral senior to the liens of the Prepetition Lenders.

50. The statutory requirement for obtaining postpetition credit under section 364(d)(l) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." In determining whether to authorize a debtor to obtain credit secured by a "priming" lien pursuant to section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets. Factors that the courts consider include, without limitation:

a. whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before court);

b. whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' businesses;

c. whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and the proposed lender or lenders;

d. whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estates and their creditors; and

e. whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37-39; *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *In re Barbara K. Enters., Inc.* Case No. 08-11474, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. Jun. 16, 2008); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003).

51.     Based upon just the limited interim access to the Prepetition Lenders' Cash Collateral, the Debtors believe that section 364(d)(1) is satisfied.   The Debtors have engaged in a constant struggle to obtain meaningful use of the Cash Collateral of their Prepetition Lenders.  Moreover, the Debtors offered the Prepetition Lenders the opportunity to provide the DIP Facility.  RBS and Credit Agricole rejected this offer.  As it currently stands, the most logical lenders have demonstrated an unwillingness to lend.  Based on these circumstances, the Debtors believe that approval of the DIP Facility under section 364(d)(1) is warranted and in the best interests of the Debtors' estates.

52.     Moreover, and as discussed in greater detail above, the Debtors' current capital resources are insufficient to maintain their ability to participate in the marketplace and maximize value for all creditors.  Therefore, the proposed financing is vital both to preserve the assets of the Debtors' estates and for the Debtors' to continue their operations as a going concern.

53.     Based upon their exploration of postpetition financing with the DIP Lender and preliminary discussions with potential third party lenders, the Debtors achieved postpetition financing on terms so favorable that they would not likely have been able to obtain from another third party.  For that reason, the DIP Facility reflects the best financing that the

Debtors were able to obtain under the unique circumstances of the truncated timeline with which the Debtors were confronted, or for that matter, under any circumstances.

54. The terms of the proposed financing are more than reasonable and adequate given the circumstances. Currently, the Debtors do not have sufficient resources to fund voyages as lengthy as the Laura Voyage, adequately support the capital intense nature of their operations, and fund these cases. Together with access to Cash Collateral and the Unrestricted Accounts, the proposed financing will provide the Debtors with the type of working capital that an international shipping business like the Debtors requires to maintain vessels and generate revenue. The DIP Facility does not require the payment of any fees, charges a below market 5% rate of interest, payment of which is deferred until maturity, does not impose any financial or other overly restrictive covenants, and has a maturity date that provides the Debtors with a generous runway in which to complete their Cases.

55. Furthermore, as described herein, the DIP Facility was prepared in good faith and the Debtors' entry into the DIP Facility is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest. The Debtors evaluated their other options and first elected to fund operations and the cost of the Cases using Cash Collateral and unencumbered cash. However, over time (and in light of the lost Laura Voyage opportunity), it became clear to the Debtors that entry into the DIP Facility is in the best interests of their estates.

56. Lastly, as detailed below, the Debtors will provide adequate protection for the Prepetition Lenders' liens on and security interests in the Prepetition Collateral to the extent of any diminution of the value of such interests.

**Requirement under Bankruptcy Code § 364(d) of Providing Adequate Protection**

57.     Any prepetition secured creditors whose liens are being "primed" postpetition by debtor in possession financing under section 364(d) of the Bankruptcy Code must be provided with adequate protection of their interests in collateral.  *See In re Swedeland Dev. Group., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (noting that adequate protection is required under section 364(d)(l)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy).   What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 Bankr. LEXIS 2456. *4 (Bankr, D. Del. Feb. 18, 1992); *see also In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992).  Through adequate protection, the Bankruptcy Code attempts to shield a secured creditor from diminution in the value of its interest in its collateral while it is being used by a debtor.  *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

58.     To protect against diminution in value, if any, resulting from the priming of the Prepetition Lenders' purported liens in the Prepetition Collateral, the Debtors propose to provide the Prepetition Lenders, to the extent of the diminution in value, the Adequate Protection Liens and the other Adequate Protection Obligations (as defined in the Interim DIP Order).

59.     The DIP Facility will enable the Debtors to stabilize their operations, generate profit from voyages, and otherwise enable the Debtors to complete the restructuring process they set out to accomplish in early 2009.  The continued operation of the Debtors' businesses and resulting cash flow will insulate the Prepetition Lenders from any diminution in value, and, in fact, enhance the value of the Prepetition Lenders' collateral.  This, the Debtors

believe, likely presents the best opportunity for the Prepetition Lenders to receive the greatest recovery on account of their claims. With access to capital, the Debtors will be able to invest in the maintenance and operation of their ships, supply provisions, pay their crews, take on the Laura Voyage and similar voyages and conduct trading. As a result of these investments and returns, the Prepetition Collateral will be more than adequately protected. *See 495 Cent. Park Ave.*, 136 B.R. at 632 (finding a secured creditor would be adequately protected against a priming debtor in possession financing facility where the proceeds from the facility were to be used to renovate the rental property that served as collateral and post-renovation rental revenues would be demonstrably increased).

60.     For the reasons discussed above, the Debtors believe that the proposed Adequate Protection to be provided for the benefit of the Prepetition Lenders is appropriate and necessary under the circumstances. Accordingly, the adequate protection proposed herein and in the DIP Orders is fair and reasonable and sufficient to satisfy the requirements of sections 363(d)(1) and (2) of the Bankruptcy Code.

**Protections Under Bankruptcy Code § 364(e)**

61.     The Debtors believe that the terms and conditions of the DIP Facility are the best possible under the circumstances of these cases, and were offered in good faith. Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of any order granting this motion are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the DIP Lender would be fully protected with respect to any amounts disbursed before such modification, vacation, stay, or termination.

**The DIP Facility is Necessary to Preserve the Assets of the Estates**

62.     It is essential that the Debtors obtain financing to ensure the continued operation of their businesses and successful completion of these Cases.  As discussed above, even if standing idle the vessels require crew and provisions.  Moreover, the vessels' engines must remain running and, consequently, require fuel.  If not fueled, a vessel runs the risk of a "black out" which places the vessel and her crew in grave danger.  The failure to pay for any one of these necessities could result in the imposition of maritime liens and potential arrest of the Debtors' ships.  No creditor would be well served by such a result.

63.     On the other hand, by obtaining access to the DIP Facility, the Debtors will be able to operate their businesses, preserve the value of their assets, and renew the confidence of their vendors, customers, employees, charter parties, and other key constituencies. Thus, approval of borrowing under the DIP Facility is crucial to maximizing the value of the Debtors' estates.

**Application of the Business Judgment Standard**

64.     As described above, after appropriate investigation and analysis, the Debtors' management concluded that the DIP Facility provided the best alternative available under the circumstances of these Cases.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See Barbara K. Enters.* at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 of the Bankruptcy Code is to be utilized on grounds

that permit a debtor's reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows: (1) That the proposed financing is an exercise of sound and reasonable business judgment . . . ."). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

65.     The Debtors have exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Facility.  Accordingly, the Court should authorize the Debtors' entry into any necessary documents and obtaining funds from the DIP Lender on the secured and administrative superpriority basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

## REQUEST FOR FINAL HEARING

66.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a final hearing (the "***Final Hearing***") on the Motion as soon as practicable, but in no event later than 30 days following the entry of the Interim Order, and fix the time and date for parties to file objections to the motion in advance of such Final Hearing.

## MOTION PRACTICE

67.     The Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their

application to this motion.  In addition to all entities otherwise entitled to receive notice, the

Debtors have given notice of this motion to all entities believed to have or be claiming an interest

in the subject matter of the proposed order or who, it is believed, otherwise would be affected by

the proposed order.  Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-

## NOTICE

68.     No trustee, examiner or creditors' committee has been appointed in these

Chapter 11 Cases.  The Debtors have provided notice of this motion to: (a) the Office of the

United States Trustee for the Southern District of New York; (b) the entities listed on the

Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to

Bankruptcy Rule 1007(d); (c) the Agents and their counsel; (d) to any party that has request for

notices with this Court; (e) counsel to Committe, (f) the Internal Revenue Service and (g) Top

Ships USA, Inc. (collectively, the "***Noticed Parties***").  The Debtors respectfully submit that no

other or further notice need be provided.

WHEREFORE, premises considered, the Debtors request that this Court enter an Interim Order (i) authorizing the Debtors, on an interim basis, to (a) obtain postpetition financing of up to $2,400,000 on a senior secured, priming, superpriority basis, (b) grant the Prepetition Lenders adequate protection in connection therewith, (c) scheduling a hearing to consider entry of the Final DIP Order, (d) granting related relief, and (e) and granting such other and further relief as the Court may deem just and proper.

Respectfully submitted this 26th day of August, 2011.

**BRACEWELL & GIULIANI LLP**

/s/ Robert G. Burns
Robert G. Burns
Andrew J. Schoulder
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
Telephone:(212) 508-6100
Facsimile: (212) 508-6101

Evan Flaschen
Evan.Flaschen@bgllp.com
Mark Dendinger
Mark.Dendinger@bgllp.com
Telephone: (860) 947-9000
Facsimile:  (860) 246-3201

Proposed Attorneys for the Debtors
and Debtors in Possession

**EXHIBIT A**
**Proposed Order**

## **EXHIBIT B**
### Cash Collateral Orders

### **TO BE SEPARATELY FILED**

**EXHIBIT C**

**DIP Agreement**