Evan D. Flaschen (EF 6973)
Robert G. Burns (RB 0970)
Andrew J. Schoulder (AS 2018)
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 508 6100
Facsimile:     (212) 508 6101

Proposed Counsel for the Debtors and Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**MARCO POLO SEATRADE B.V.,** *et al.*,[1]<br><br>Debtors. | **Chapter 11**<br><br>**Case No. 11-13634 (JMP)**<br><br>**Jointly Administered** |

**DECLARATION OF BARRY MICHEL**
**CERNEUS IN SUPPORT OF DEBTORS'**
**MOTION FOR ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN**
**POSTPETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION,**
**(III) SCHEDULINGA FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

Barry Michel Cerneus, being duly sworn, deposes and states:

1.  I am the attorney in fact of Seaarland Shipping Management B.V. ("*Seaarland*"), one of the above-captioned debtors and debtors in possession (collectively, the "*Debtors*"). I have been working for Seaarland since August 2005. I am familiar with the Debtors' day-to-day operations, business, financial affairs and books and records. In addition, I am generally familiar with matters relating to international maritime finance, charter parties and commercial vessel management services, which are among the core operations of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's identification number, include: Marco Polo Seatrade B.V. (5584); Seaarland Shipping Management B.V. (0110); Magellano Marine C.V. (2910); and Cargoship Maritime B.V. (4361). The Debtors' service address is: Bracewell & Giuliani, LLP, 1251 Avenue of the Americas, 49th Floor, New York, NY 10020, Attn: Robert G. Burns.

2. I submit this declaration (the "**Declaration**") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "**DIP Motion**"),[2] which seeks approval of the Debtors' senior secured priming credit facility of up to $4.8 million (the "**DIP Facility**").[3]

3. The statements in this Declaration are, except where specifically noted, based on either my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors working directly with me or under my supervision, direction or control, or from the Debtors' records maintained in the ordinary course of their business. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors. In addition to the statements set forth below, I make reference to the Declaration of Barry Michel Cerneus (I) in Support of Debtors' Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2 (the "**First Day Declaration**"), which is incorporated herein by reference.

## The Debtors' Need for the DIP Facility

4. As explained in the First Day Declaration, the Debtors sought relief under Chapter 11 with less than twenty-four hours of preparation. Consequently, the Debtors did not have the opportunity prepetition to approach the capital markets for postpetition financing. Even so, at the outset of the Chapter 11 Cases, the Debtors believed that they could continue to operate their businesses and pay for the restructuring costs if they were able to access their Cash Collateral, including cash in the Unrestricted Accounts.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion.
[3] A more complete description of the DIP Facility is set forth in the DIP Motion.

5. On August 18, 2011, the Debtors were offered an opportunity to trade the Laura, one of the three vessels secured under the Credit Agricole loan, on a voyage that was estimated to yield up to $700,000 in net profit. The Debtors believed that the upfront expenses for this voyage would be approximately $2 million. The expenses would have covered, among other things, fuel costs, insurance premiums, straight and port costs (the "***Laura Voyage Expenses***"). Approximately half of the Laura Voyage Expenses would need to have been paid within 6 days of embarking on the voyage (the "***Initial Laura Voyage Expenses***").

6. As is typical in the Debtors' industry, the Debtors were required to confirm their acceptance of the Laura Voyage on quick turnaround basis. Thus, immediately upon receiving the offer for the Laura Voyage, the Debtors concluded that they had two alternatives to fund the Laura Voyage Expenses. The first most likely alternative was obtaining funding from Credit Agricole and the Credit Agricole Lenders. As of August 19, 2011, the balance of the Credit Agricole Cash Collateral was zero. Although the Debtors expected to receive receivables associated with the Credit Agricole Ships in the near term, including a payment from A.P. Moller-Maersk A/S,[4] even these amounts would have been insufficient to support the Laura Voyage Expenses. For that reason, on August 19, 2011, the Debtors requested that Credit Agricole and the Credit Agricole Lenders advance the funds necessary for the Debtors to undertake the Laura Voyage. It is my understanding that upon receiving the request from the Debtors, Credit Agricole and the Credit Agricole Lenders began to review the voyage particulars to determine whether they would be willing to fund the voyage.

7. Even while Credit Agricole was reviewing the funding request, by the morning of August 22, 2011, the Debtors realized that any further delay in confirming their availability for the Laura Voyage would further harm the Debtors' chances of trading the Laura on this voyage.

---

[4] *See* Stipulation between Debtors and A.P. Moller-Maersk A/S. [Docket No. 71].

Given the importance of the Laura Voyage to the Debtors' cash flows and reputation in the shipping industry, the Debtors confirmed their availability for the Laura Voyage and began formulating a back-up strategy that contemplated use of cash in the Unrestricted Accounts, if necessary, and the debtor in possession financing relief requested by the Motion. Regrettably, prior to gaining access to the necessary capital, the Debtors were informed that the charterer ultimately chose not to hire the Laura for the Laura Voyage. It is my understanding that the charterer chose not to hire the Laura due in part to the Debtors' delayed response and the charterer's shaken confidence in the Debtors' ability to prefund the voyage.

8. The Debtors, in their business judgment, have determined that the risks associated with losing another profitable voyage are too great. In addition to the direct economic benefits of trading the Laura on a spot basis, the Debtors believe that Laura voyages will have an indirect economic benefit for all of their vessels, including the RBS Ships. It is my understanding that participants in both the spot market and pool markets are closely monitoring the trading of all of the Debtors' vessels. These participants do not distinguish between RBS Ships and Credit Agricole Ships. The Debtors believe that future Laura voyages will send a strong message to the shipping market regarding the Debtors' ability to operate their vessels and take on capital intense voyages. If, however, the Debtors are unable to timely accept future high paying voyages or otherwise pay crews and maintain their vessels because they lack adequate and flexible sources of funding, the Debtors fear this would send a negative message to the markets, which could set back the Debtors restructuring efforts. In the shipping industry in particular, timing is just as critical of a component to the success of a business. If the Debtors are unable to operate their businesses in the ordinary course and accept profitable voyages without the need to constantly

seek concessions from the Prepetition Lenders, the Debtors risk losing the progress they have made since the Petition Date.

9. For those reasons, the Debtors are seeking the relief requested in this Motion. In doing so, the Debtors will be provided with the operational flexibility to undertake profitable voyages in the future.

10. Access to the DIP Facility is critical to the Debtors' efforts to fund ongoing operations, stabilize their businesses and preserve their going concern value. From an operational perspective, without access to sufficient working capital to fund voyages, the Debtors' vessels, especially the Laura, will become defunct and unattractive to future charter parties. In pure economic terms, the Debtors' vessels are significantly more valuable when operating under a contract to ship cargo than when the ships remain idle in international waters. By providing the Debtors with access to sufficient working capital, the Debtors will be able to generate revenue and profit from the voyages they undertake.

11. The last four weeks have demonstrated that the current working capital arrangements with RBS and Credit Agricole do not provide sufficient flexibility for the Debtors to operate their business in a manner that will maximize value. While I believe Credit Agricole acted in good faith, for the Debtors to reorganize, they need the independence to operate their business free from the need to seek consent from the Prepetition Lenders to embark on every profitable voyage. I believe that the DIP Facility (and its support for upfront operating expenses) will provide the necessary level of operational independence and flexibility.

### **The Debtors' Efforts to Obtain Postpetition Financing**

12. Following entry of the Interim Cash Collateral Order, the Debtors spent a significant amount of time evaluating their long term restructuring options. Through their

counsel, the Debtors approached various financial institutions, including private equity and hedge funds, in hopes of obtaining postpetition financing on reasonable terms. The Debtors, through their counsel, also contacted a financial institution that I have been informed regularly serves as administrative agent for postpetition financings within the commitment range of the DIP Facility. Of the eight institutions contacted by the Debtors in this limited timeframe, only two funds expressed an interest in providing the financing, both with steep rates of interest (ranging from 13 to 15%) and fees (ranging from 2 to 6%). While I understand from counsel to the Debtors that these rates are currently "market" for postpetition financings, relative to the fees and interest under the DIP Facility, I determined that the DIP Facility was much more advantageous. For the other six financial institutions, the parties declined due to, among other reasons, the size of the facility was below minimum lending thresholds, the restrictions on lending against assets not located in the U.S., an unwillingness to participate in a priming fight, and an unwillingness to lend on a stand-by basis because the requirement to commit funds would not yield a sufficient rate of return.

13. I have also been informed that the Debtors' legal advisors have contacted RBS and Credit Agricole regarding their interest in providing postpetition financing. I understand that both have declined to provide postpetition financing.

14. After canvassing the marketplace, and based on discussions with the Debtors' legal advisors regarding current market terms for financings of this type, I believe that the DIP Lender is the only party capable of providing the necessary financing on the most favorable economic terms and least restrictive basis.

## The DIP Lender

15. The DIP Lender is a joint venture created by MPS and Bentonwood B.V. ("**Bentonwood**") in 2010 for the purpose of contracting for the construction of three vessels. I understand from counsel that by the time of the hearing to consider the DIP Motion the Debtors will have a power of attorney from Bentonwood with respect to its 50% interests in the DIP Lender.

16. It is my understanding that in early 2011, the DIP Lender reached an agreement to sell the three shipbuilding contracts with Hyundai to a third party. The sale generated $9.8 million in net proceeds to be distributed equally to the DIP Lender's shareholders. To my knowledge, Bentonwood has already received its share of the proceeds from the DIP Lender. MPS has not received its share of the proceeds because Top Ships, Inc. ("**Top Ships**"), through its owner nominees Indiana R. Shipping Co. Ltd. ("**Indiana**") and Banksy Shipping Company Limited ("**Banksy**"), was granted a prejudgment attachment by a court in Amsterdam on MPS's shares in the DIP Lender, blocking distribution of the proceeds to MPS. It is my understanding that the attachment relates to a disputed claim by Top Ships against MPS, not the DIP Lender.

17. I have been advised by Dutch counsel that the attachment relates solely to the shares of the DIP Lender and any economic benefits that would be distributed through a share dividend or other shareholder distribution to MPS. I have been further advised by Dutch counsel that the Top Ships attachment does not extend to any of the assets of the DIP Lender, which, to my knowledge, has no obligations to Top Ships.

### The Terms of the DIP Facility

18. The DIP Facility is a stand-by facility for up to $4.8 million and is conditioned on the Debtors' receipt of access to the Cash Collateral on the terms set forth in the Final Cash Collateral Orders. Other than the Laura Voyage Draw, if any, and costs for future Laura

voyages, the Debtors would only have the right to draw down amounts necessary to cover costs if no Cash Collateral is available and using unencumbered cash would cause the balance of the Unrestricted Accounts to fall below $300,000 or if use of the Cash Collateral would cause the Debtors to exceed a 15% line-item variance in the Budget. Based on my review of the Debtors' Budget and working capital needs, I believe that these terms will provide the Debtors with the flexibility and independence necessary to operate their businesses in the ordinary course.

19. The Debtors believe that these terms will (i) enhance the Debtors' ability to quickly act on future spot voyages for the Laura, (ii) provide the Debtors with the necessary flexibility to operate their businesses in a manner that will maximize the value of their estates, including the Prepetition Collateral, (iii) reasonably address their need for financing, and (iv) constitute the best financing option available to them given the circumstances of their business, their capital structure, and these Cases. Based on a diligent market check, I understand that the rate of interest on the DIP Facility is materially below the market rate for debtor in possession financings of this type. Indeed, in light of the size of the DIP Facility - $4.8 million - I do not believe the Debtors would have been able to find an alternative source willing to provide such financing on the current pricing as the DIP Facility, let alone on a stand-by basis. Specifically, the DIP Facility does not require the payment of financing fees, bears interest at the rate of 5%, contains limited covenants, has no milestones, and upon advice of counsel does not grant liens on Avoidance Actions.

20. Additionally, the Debtors' existing secured debt and nominal unencumbered assets have further limited the Debtors' ability to obtain incremental financing. After canvassing the market, including the Prepetition Lenders, it became evident to the Debtors that the grant of

priming liens and superpriority administrative expense treatment to secure the DIP Facility was a necessary and critical component of the DIP Facility.

21. As mentioned above, the DIP Facility addresses the Debtors' need for the working capital necessary to fund spot Laura voyages and will permit the Debtors to start generating cash flow to further sustain and operate the businesses, as well as to pay costs of the chapter 11 cases.

22. In sum, I believe that the terms of the DIP Facility are fair and reasonable and in the best interest of the Debtors' estates.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing statements are true and correct.

Dated: Amsterdam, The Netherlands
       August 26, 2011

*/s/ Barry Michel Cerneus*___
Barry Michel Cerneus
Authorized Signatory